**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MERTZ CORPORATION d/b/a NAI MERTZ CORPORATION**<br>**21 Roland Avenue**<br>**Mount Laurel, NJ 08054**<br><br>**Plaintiff,**<br>**vs.**<br><br>**JNG HOLDINGS, LLC**<br>**1859 Brookwood Drive**<br>**Bensalem, PA 19020**<br><br>**and**<br><br>**JAMAL AWAD**<br>**1859 Brookwood Drive**<br>**Bensalem, PA 19020**<br><br>**and**<br><br>**MOHAMMAD AWAD**<br>**1859 Brookwood Drive**<br>**Bensalem, PA 19020**<br><br>**and**<br><br>**DE RONG LIU A/K/A DERONG LIU A/K/A TOMMY LIU**<br>**9302 Voits Lane**<br>**Philadelphia, PA 19115**<br><br>**Defendants.** | : | **CIVIL ACTION NO.** |

**CIVIL ACTION COMPLAINT**

1. Plaintiff, Mertz Corporation d/b/a NAI Mertz Corporation ("Plaintiff"), is a New Jersey corporation with an address at 21 Roland Avenue, Mount Laurel, NJ 08054.

2. Plaintiff is a citizen and is incorporated in New Jersey and has its nerve center in New Jersey. While there are satellite offices in Pennsylvania, and the contract at issue is governed by Pennsylvania law, the place of actual direction, control, and coordination is at Plaintiff's headquarters in New Jersey. Furthermore, all of Plaintiff's officers are headquartered in New Jersey.

3. Defendant, JNG Holdings, LLC ("JNG"), is a Pennsylvania limited liability company with an address at 1859 Brookwood Drive, Bensalem, PA 19020.

4. JNG is a citizen and is incorporated in Pennsylvania and has its principal place of business in Pennsylvania. Upon information and belief, the members of JNG are citizens of Pennsylvania.

5. Defendant, Jamal Awad ("Jamal"), is an adult individual with an address at 1859 Brookwood Drive, Bensalem, PA 19020.

6. Jamal is a citizen of the Commonwealth of Pennsylvania.

7. Defendant, Mohammad Awad ("Mohammad"), is an adult individual with an address at 1859 Brookwood Drive, Bensalem, PA 19020.

8. Mohammad is a citizen of the Commonwealth of Pennsylvania. Mohammad, Jamal, and JNG are collectively referred to as "JNG Defendants."

9. Defendant, De Rong Liu a/k/a Derong Liu a/k/a Tommy Liu ("Liu"), is an adult individual with an address at 9302 Voits Lane, Philadelphia, PA 19115. JNG Defendants and Liu are collectively referred to as "Defendants."

10. Liu is a citizen of the Commonwealth of Pennsylvania.

## JURISDICTION & VENUE

11. Jurisdiction is vested in this Court pursuant to 28 U.S.C. §1332(a), in that Plaintiff is a citizen and/or is incorporated and/or has its principal place of business and/or has its nerve center in New Jersey and Defendants are citizens and/or are incorporated and/or have their principal places of business in the Commonwealth of Pennsylvania, and there exists complete diversity of citizenship, and the amount in controversy exceeds the sum or value of Seventy-Five Thousand ($75,000.00) Dollars.

12. Venue for this action is properly laid in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391(b)(1) in that all Defendants are residents of this judicial district.

## FACTS

13. Plaintiff is a commercial real estate broker.

14. JNG owns the property located at 1858 Street Road, Bensalem, PA 19020 (the "Premises").

15. Upon information and belief, Jamal and Mohammad are members of JNG.

16. On August 3, 2022, Plaintiff and the prior owner of the Premises, George S. Pavlis ("Pavlis"), entered into an Exclusive Right to Sell Agreement, for which Pavlis granted Plaintiff the exclusive right to sell the Property within a one-year term (the "Term"). A copy of the Exclusive Right to Sell Agreement is attached hereto as Exhibit "A."

17. During the Term, and as explained below, Plaintiff had the exclusive right to negotiate a sale or exchange regardless of who negotiated the same, and the Owner, as defined below, agreed to pay to Plaintiff a commission of 3.75% of the gross sale price (or of the market

value of the consideration received by the Owner in an exchange) of the Premises upon the closing of titles. *See Id.* at Section 2.

18. For purposes of the Exclusive Right to Sell Agreement, a Buyer is defined as "any individual or entity introduced to Premises during Term who enters into a sale or exchange of the premises, including (I) any of Buyer's parent, subsidiary or sister corporations and any other corporation ("Affiliated Corporation") which is controlled by any principals ("Controlling Person") having a controlling interest in Buyer, whether individually or as a group (ii) any partnership, joint venture, or trust in which Buyer, an affiliated Corporation or any Controlling Person has a controlling interest and (iii) heirs, executors, administrators, successors and assigns of Buyer." *See Id.*

19. For purposes of the Exclusive Right to Sell Agreement, the "Owner" includes (1) any of Owner's parent, subsidiary or sister corporations and other corporation ("Affiliated Corporation") which is controlled by any principals ("Controlling Person") having a controlling interest in Owner, whether individually or as a group (b) any partnership, joint venture, or trust in which Owner, an Affiliated Corporation or any Controlling Person has a controlling interest and (c) heirs, executors, administrators, successors and assigns of Owner. *See Id.* at Section 3.

20. Section 6 of the Exclusive Right to Sell Agreement states as follows:

6. LEASING COMMISSION

(a) Even though it is not intent of the Owner to lease the Premises or any part of the Premises or to have improvements constructed on the Premises, should a lease be entered into between Owner and another party or entity ("Tenant") for the Premises and/or improvements on the Premises during the term of this Agreement, then Owner shall pay to Broker a leasing commission of six percent (6%) of gross rents to be paid to Owner under the Lease ("Leasing Commission"). The Leasing Commission shall be earned, due and payable upon execution of the Lease by both Owner and the Tenant and the payment of the first month's rent under the Lease. Owner agrees to insert a paragraph in the lease stating that Mertz Corporation is the Broker of record pertaining to the lease.

(b) In the event a Tenant continues its tenancy at the Premises after the expiration of the original term ("Original Term") of the Lease, whether pursuant to a renewal, extension, renegotiation of any kind or new lease agreement for the Premises, ("Extended Term"), Owner shall pay to Broker a commission which shall be calculated on the basis of the commission rate set forth in subparagraph (a) of this paragraph 6, and as though the Extended Term had been a part of the Original Term up to the total term (including the Original Term) of the Tenant's right to possession. In addition, if during the Original Term or Extended Term, the Tenant leases additional space at the Premises from the Owner, Owner shall pay to Broker a commission in the amount of four percent (4%) of the gross rents to be paid to Owner under the renewal, extension, renegotiation or new lease agreement providing for such additional space. Commissions for any Extended Term and/or for additional space rented at the Premises shall be earned, due and payable upon execution of the renewal, extension, expansion or new lease agreement (as the case may be) by both Owner and the Tenant and the payment of the first month's rent under the Lease.

(c) In the event Owner sells (or exchanges) the Premises or any portion of the Premises to Tenant ("Tenant") procured by Broker, Owner shall pay to Broker a sales commission of three & three-quarters percent (3.75%) of the gross sale price or of the market value of the consideration received by the Owner in such exchange of the Premises. For purposes of this Agreement, "Tenant" shall include (i) any of Tenant's parent, subsidiary or sister corporations and any other corporation ("Affiliated Corporation") which is controlled by any principals ("Controlling Person") having a controlling interest in Tenant, whether individually or as a group (ii) any partnership, joint venture, or trust in which Tenant, an affiliated Corporation or any Controlling Person has a controlling interest and (iii) heirs, executors, administrators, successors and assigns of Tenant.

*See Id.* at Section 6.

21. Section 8 of the Exclusive Right to Sell Agreement states:

8. SALE OR LEASE AFTER TERMINATION

(a) In the event any person, corporation, partnership or other entity who, during the Term, has been shown the Premises or has made an offer to purchase or lease the Premises ("Prospective Purchaser or Tenant") enters into a contract to purchase or lease the Premises within twelve (12) months of the expiration of the Term, Owner shall pay to Broker the Sales Commission or Leasing Commission, as the case may be.

(b) If Owner does not enter into an exclusive listing agreement with another broker after the expiration of this Agreement, and permits Broker to continue to bring new prospects to the Premises, should a contract to purchase or lease be entered into by the Owner and new Prospect within one (1) year of the Prospects' being shown the Premises, Owner agrees to pay to Broker a Commission as per Sections 2 & 6 of this Agreement.

*See Id.* at Section 8.

22. Section 16 of the Exclusive Right to Sell Agreement states:

16. LEGAL FEES AND INTEREST

(a) In the event Broker does not receive commissions due under this Agreement, Owner shall be responsible for all reasonable legal fees and related expenses incurred by Broker in collection of such commissions.

(b) Interest shall accrue and be due and owing on all monies owed pursuant to this Agreement from the due date to the date payment has been received by Broker at an annual rate equal to five percent (5%).

*See Id.* at Section 16.

23. Jamal was one of the witnesses to the Exclusive Right to Sell Agreement. *See Id.*

24. Per the Exclusive Right to Sell Agreement, the asking sale price was listed at $21,000,000.00. *See Id.*

25. On January 18, 2023, Plaintiff and Pavlis entered into a First Amendment to Exclusive Right to Sell Agreement, reducing the asking sale price to $9,950,000.00 and extending the Term until March 12, 2024. A copy of the First Amendment to Exclusive Right to Sell Agreement is attached hereto as Exhibit "B."

26. On March 12, 2024, Plaintiff and Pavlis entered into a Second Amendment to Exclusive Right to Sell Agreement, which extended the Term until December 31, 2024. A copy of the Second Amendment to Exclusive Right to Sell Agreement is attached hereto as Exhibit

"C."

27. During the Term, Plaintiff listed and marketed the Premises and otherwise performed all of its obligations pursuant to the Exclusive Right to Sell Agreement and any amendments thereto.

28. Jamal and Mohammad worked closely with Plaintiff in order to sell the Premises as Pavlis had become gravely ill.

29. During the Term, Plaintiff introduced Liu as a potential buyer of the Premises to Pavlis, Jamal, and Mohammad.

30. On June 27, 2024, Pavlis died, leaving a Last Will and Testament naming Jamal as the executor, heir, and beneficiary of the Estate of George S. Pavlis, Deceased.

31. Three (3) days prior to Pavlis's death, the Premises was transferred for $1 by Pavlis, by and through his Power-of-Attorney, Jamal, to JNG, a limited liability company owned and operated by Jamal and his son, Mohammad.[1]

32. JNG is an "owner" of the Premises as defined in the Exclusive Right to Sell Agreement as it is the successor to Pavlis.[2]

33. Jamal and Mohammad continued to work closely with Plaintiff to sell the Premises.

34. On September 17, 2024, Liu decided to purchase the Premises for a purchase price of $8.5 million, and Plaintiff issued a Letter of Intent to Jamal, Mohammad, and Liu, which

---

[1] Notably, there was never an Estate raised for Pavlis, and all of Pavlis's assets were transferred to Jamal and/or JNG prior to Pavlis's death. Additionally, technically Plaintiff was entitled to a commission arising out of this transfer but was never paid.

[2] If JNG is not deemed a "successor," then under the law, any seller could circumvent a commission agreement by gifting a property for a nominal price to a third party, who would then sell it.

confirmed that Plaintiff was the sole real estate broker in the transaction and would receive a commission payable based on the gross sale price. A copy of the Letter of Intent is attached hereto as Exhibit "D." Plaintiff requested the executed Letter of Intent from Defendants, but Defendants ignored Plaintiff's requests.

35. Subsequent to the Letter of Intent, Liu and JNG Defendants negotiated an agreement of sale, which upon information and belief, was ultimately executed, with a sale price of $8.2 million. A copy of a draft agreement of sale is attached hereto as Exhibit "E." Plaintiff requested the executed agreement of sale from all Defendants, but Defendants ignored Plaintiff's requests.

36. Plaintiff's introduction of Liu to the JNG Defendants was made during the Term of the Exclusive Right to Sell Agreement.

37. The agreement of sale was also executed during the Term.

38. Plaintiff later learned that, despite Liu being ready, willing and able to close, JNG and Liu ultimately did not close on the sale of the Premises, and instead, entered into a lease agreement.

39. Plaintiff attempted to secure the lease agreement between Liu and JNG from Defendants on several occasions, but Defendants again ignored Plaintiff's requests.

40. In the meantime, several press releases and local news articles circulated which stated that Liu partnered with Jamal in order to revitalize and reopen the Premises. Copies of several articles and social media pages are attached hereto as Exhibit "F."

41. Notably, when Plaintiff attempted to secure the executed agreement of sale and lease agreement from Liu, Liu refused to provide the same and told Plaintiff that he no longer

had a relationship with the JNG Defendants and was not involved with the Premises, other than performing the building renovations.

42. Liu also told Plaintiff that JNG sold the Premises to an unspecified Maryland company.

43. However, the Bucks County assessor's records do not indicate that the Premises was sold.

44. Additionally, an internet search also did not support Liu's representation or retract statements made in the articles and social media pages attached Exhibit "F," and it is clear that Liu and the JNG Defendants remain partners with regard to this transaction and the Premises.

45. Plaintiff demanded leasing commissions in accordance with Section 6 of the Exclusive Right to Sell Agreement and a sale commission in accordance with Section 2 of the Exclusive Right to Sell Agreement, but the JNG Defendants failed to pay the same.

46. On July 8, 2026, counsel for Plaintiff demanded the commissions owed to Plaintiff by the JNG Defendants; and, as further evidence of the JNG Defendants' intent to circumvent payment to Plaintiff, the JNG Defendants failed to respond. A copy of the e-mail is attached hereto as Exhibit "G."

47. The JNG Defendants are legally obligated to pay Plaintiff a sale commission, as Plaintiff brought a ready, willing and able buyer to the Premises, and all Defendants conspired to chill Plaintiff's right to a commission by voluntarily not closing, upon information and belief, in order to avoid paying commissions to Plaintiff.

48. As the agreement of sale lists the gross sale price as $8.2 million, the Defendants are legally obligated to pay to Plaintiff commission in the amount of $307,500.00.

49. In the alternative, Defendants are legally obligated to pay lease commissions to Plaintiff from the commencement of the lease to the present. Plaintiff are unable to calculate the amount of lease commissions due since Defendants have refused to supply the leasing agreement between JNG and Liu. It is believed that the gross rents during the leasing term are substantial.

**COUNT I - BREACH OF CONTRACT**
**PLAINTIFF V. DEFENDANT, JNG HOLDINGS, LLC**

50. Plaintiff incorporate by references averments 1 through 49 set forth above as if same were fully set forth at length herein.

51. Plaintiff and Pavlis entered into the Exclusive Right to Sell Agreement, which was amended twice. *See* Exhibits "A" through "C."

52. JNG was Pavlis's successor and thus was bound to the Exclusive Right to Sell Agreement as an "Owner" in accordance with Section 3 of the Exclusive Right to Sell Agreement. *See* Exhibit "A."

53. JNG had a duty to act in good faith and deal fairly with Plaintiff in the performance of the Exclusive Right to Sell Agreement.

54. Plaintiff procured Liu as a ready, willing, and able buyer of the Premises.

55. Despite agreeing to pay Plaintiff sale commissions, and despite Plaintiff procuring Liu as buyer of the Premises, JNG has refused to pay a sale commission as required by the terms of the Exclusive Right to Sell Agreement, under the guise that the sale never closed.

56. JNG has breached the Exclusive Right to Sell Agreement, and the good faith and fair dealing requirement inherent in all contracts, because Plaintiff procured a ready, willing, and able buyer, and JNG chilled Plaintiff's right to a commission by not closing. *See* Exhibits "A"

through "C."

57. JNG is legally obligated to pay the sale commission to Plaintiff.

58. Additionally, JNG is legally obligated to pay to Plaintiff all reasonable legal fees and related expenses incurred by Plaintiff in collection of the commissions and interest at 5% per annum from the date of the agreement of sale between JNG and Liu to the present. *See* Exhibit "A" at Section 16.

WHEREFORE, Plaintiff, Mertz Corporation d/b/a NAI Mertz Corporation, demands judgment in its favor and against Defendant, JNG Holdings, LLC, for an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), and attorney fees and costs incurred in connection with its collection efforts, together with interest and costs.

**COUNT II - BREACH OF CONTRACT (IN THE ALTERNATIVE)**
**PLAINTIFF V. DEFENDANT, JNG HOLDINGS, LLC**

59. Plaintiff incorporates by reference averments 1 through 58 set forth above as if same were fully set forth at length herein.

60. Plaintiff and Pavlis entered into the Exclusive Right to Sell Agreement, which was amended twice. *See* Exhibits "A" through "C."

61. JNG was Pavlis's successor and thus was bound to the Exclusive Right to Sell Agreement as an "Owner" in accordance with Section 3 of the Exclusive Right to Sell Agreement. *See* Exhibit "A."

62. JNG had a duty to act in good faith and deal fairly with Plaintiff in the performance of the Exclusive Right to Sell Agreement.

63. Plaintiff procured Liu as a ready, willing, and able buyer of the Premises.

64. Despite agreeing to pay Plaintiff leasing commissions, and despite Plaintiff procuring Liu as buyer of the Premises, who ultimately entered into a lease with JNG, JNG has refused to pay any leasing commission as required by the terms of the Exclusive Right to Sell Agreement.

65. To date, in the event that this Court determines that Plaintiff is not legally entitled to a sale commission, which Plaintiff denies, JNG is legally obligated to pay to Plaintiff leasing commissions arising out of the lease between Liu and/or his affiliate and JNG for the Premises in accordance with the Exclusive Right to Sell Agreement.

66. JNG is legally obligated to pay to Plaintiff all reasonable legal fees and related expenses incurred by Plaintiff in collection of the commissions and interest at 5% per annum from the date of the lease between JNG and Liu to the present. *See* Exhibit "A" at Section 16.

67. Plaintiff has made demand on JNG for commissions owed and owing but JNG has failed and refused to pay the commissions to Plaintiff despite the requirements of the Exclusive Right to Sell Agreement.

68. As a result of the aforementioned failure to pay Plaintiff the commission, JNG, as successor to Pavlis, has breached the Exclusive Right to Sell Agreement with Plaintiff. *See* Exhibits "A" through "C."

WHEREFORE, Plaintiff, Mertz Corporation d/b/a NAI Mertz Corporation, demands judgment in its favor and against Defendant, JNG Holdings, LLC, for an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), and attorney fees and costs incurred in connection with its collection efforts, together with interest and costs.

**COUNT III - QUANTUM MERUIT/UNJUST ENRICHMENT (IN THE ALTERNATIVE) PLAINTIFF V. DEFENDANT, JNG HOLDINGS, LLC**

69. Plaintiff incorporates by reference averments 1 through 68 set forth above as if same were fully set forth at length herein.

70. To the extent that the Court finds that there was not a contract between Plaintiff and JNG, which Plaintiff denies, Plaintiff marketed the Premises and procured Liu as a ready, willing, and able buyer for the Premises.

71. The value of services performed by Plaintiff that remains due and owing is 3.75% of the gross purchase price of the Premises arising out of the sale of the Premises to Liu and/or his affiliate, plus attorney fees and interest.

72. The services performed by Plaintiff have benefitted JNG as JNG could have sold the Premises to Liu, which would not have happened but for Liu being procured by Plaintiff.

73. The sole reason, upon information and belief, that the Premises has not been formally sold to Liu was Defendants have been attempting to chill Plaintiff's right to a commission.

74. The retention of the benefit conferred upon JNG by Plaintiff without payment would be unjust.

75. JNG would be unjustly enriched if it were permitted to retain the benefit of Plaintiff's services without payment therefore.

76. If it is found that a contract does not exist between Plaintiff and JNG, such fact denied, Plaintiff is entitled to recover a sale commission under the theory of quantum meruit/unjust enrichment.

WHEREFORE, Plaintiff, Mertz Corporation d/b/a NAI Mertz Corporation, demands judgment in its favor and against Defendant, JNG Holdings, LLC, for an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), and attorney fees and costs incurred in connection with its collection efforts, together with interest and costs.

**COUNT IV - QUANTUM MERUIT/UNJUST ENRICHMENT (IN THE ALTERNATIVE)**
**PLAINTIFF V. DEFENDANT, JNG HOLDINGS, LLC**

77. Plaintiff incorporates by reference averments 1 through 76 set forth above as if same were fully set forth at length herein.

78. To the extent that the Court finds that there was not a contract between Plaintiff and JNG, which Plaintiff denies, Plaintiff marketed the Premises and procured Liu as a ready, willing, and able buyer for the Premises.

79. In the event that this Court determines that Plaintiff is not legally entitled to a sale commission, which Plaintiff denies, the value of services performed by Plaintiff is equivalent to 6% of gross rents arising out of the lease of the Premises between JNG and Liu and/or his affiliate, plus attorney fees and interest.

80. The services performed by Plaintiff have benefitted JNG as JNG is currently leasing the Premises to Liu, which would not have happened but for Liu being procured by Plaintiff.

81. The retention of the benefit conferred upon JNG by Plaintiff without payment would be unjust.

82. JNG would be unjustly enriched if it were permitted to retain the benefit of Plaintiff's services without payment therefore.

83. If it is found that a contract does not exist between Plaintiff and JNG, such fact denied, Plaintiff is entitled to recover a sale commission under the theory of quantum meruit/unjust enrichment.

WHEREFORE, Plaintiff, Mertz Corporation d/b/a NAI Mertz Corporation, demands judgment in its favor and against Defendant, JNG Holdings, LLC, for an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), and attorney fees and costs incurred in connection with its collection efforts, together with interest and costs.

**COUNT V - QUASI CONTRACT/PROMISSORY ESTOPPEL
(IN THE ALTERNATIVE)
PLAINTIFF V. DEFENDANT, JNG HOLDINGS, LLC**

84. Plaintiff incorporates by reference averments 1 through 83 set forth above as if same were fully set forth at length herein.

85. If the Court finds that there was no contract between JNG and Plaintiff, which Plaintiff denies, JNG's promises, confirmations, and assurances to pay Plaintiff commissions for buyers introduced by Plaintiff to the Premises were clear and unambiguous and made with the authority to make such promises.

86. As alleged above, and incorporated herein by reference, JNG has breached these promises and assurances.

87. As alleged above, and incorporated by reference, Plaintiff relied on JNG's promises, confirmations and assurances that commissions would be provided and worked diligently to market and list the Premises for sale and ultimately procured a buyer for the Premises.

88. Plaintiff's reliance was reasonable and foreseeable.

89. As a direct and proximate result of JNG's acts as alleged above in breaching its promises and assurances to Plaintiff, Plaintiff has been damaged in an amount equivalent to 3.75% of the gross sale price of the Premises to Liu and/or his affiliate, as set forth in the Exclusive Right to Sell Agreement, plus attorney fees and interest.

WHEREFORE, Plaintiff, Mertz Corporation d/b/a NAI Mertz Corporation, demands judgment in its favor and against Defendant, JNG Holdings, LLC, for an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), and attorney fees and costs incurred in connection with its collection efforts, together with interest and costs.

**COUNT VI - QUASI CONTRACT/PROMISSORY ESTOPPEL**
**(IN THE ALTERNATIVE)**
**PLAINTIFF V. DEFENDANT, JNG HOLDINGS, LLC**

90. Plaintiff incorporates by reference averments 1 through 89 set forth above as if same were fully set forth at length herein.

91. If the Court finds that there was no contract between JNG and Plaintiff, and JNG is not obligated to pay to Plaintiff sale commission, both of which Plaintiff denies, JNG's promises, confirmations, and assurances to pay Plaintiff leasing commissions for buyers introduced by Plaintiff to the Premises who ultimately lease the Premises were clear and unambiguous and made with the authority to make such promises.

92. As alleged above, and incorporated herein by reference, JNG has breached these promises and assurances.

93. As alleged above, and incorporated by reference, Plaintiff relied on JNG's promises, confirmations and assurances that commissions would be provided and worked diligently to market and list the Premises for sale and ultimately procured a buyer for the

Premises, who leased the Premises.

94. Plaintiff's reliance was reasonable and foreseeable.

95. As a direct and proximate result of JNG's acts as alleged above in breaching its promises and assurances to Plaintiff, Plaintiff has been damaged in an amount equivalent to 6% of the gross rents of the Premises to Liu and/or his affiliate, plus attorney fees and interest.

WHEREFORE, Plaintiff, Mertz Corporation d/b/a NAI Mertz Corporation, demands judgment in its favor and against Defendant, JNG Holdings, LLC, for an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), and attorney fees and costs incurred in connection with its collection efforts, together with interest and costs.

**COUNT VII – DECLARATORY JUDGMENT**
**PLAINTIFF V. DEFENDANT, JNG HOLDINGS, LLC**

96. Plaintiff incorporates by reference averments 1 through 95 set forth above as if same were fully set forth at length herein.

97. Plaintiff and Pavlis entered into the Exclusive Right to Sell Agreement, which was amended twice. *See* Exhibits "A" through "C."

98. JNG was Pavlis's successor and thus was bound to the Exclusive Right to Sell Agreement as an "Owner" in accordance with Section 3 of the Exclusive Right to Sell Agreement. *See* Exhibit "A."

99. JNG had a duty to act in good faith and deal fairly with Plaintiff in the performance of the Exclusive Right to Sell Agreement.

100. Plaintiff procured Liu as a ready, willing, and able buyer of the Premises.

101. Despite agreeing to pay Plaintiff sale commissions, and despite Plaintiff procuring Liu as buyer of the Premises, JNG has refused to pay any sale commission as required by the

terms of the Exclusive Right to Sell Agreement, under the guise that the sale never closed.

102. JNG has breached the Exclusive Right to Sell Agreement, and the good faith and fair dealing requirement inherent in all contracts. *See* Exhibits "A" through "C."

103. Plaintiff respectfully requests that the Court enter a declaratory judgment finding that JNG is legally obligated to pay the sale commission to Plaintiff in the event that any sale of the Premises in the future with Liu and/or Liu's affiliates closes, because Plaintiff procured a ready, willing, and able buyer, and JNG chilled Plaintiff's right to a commission by not closing.

WHEREFORE, Plaintiff, Mertz Corporation d/b/a NAI Mertz Corporation, demands judgment in its favor and against Defendant, JNG Holdings, LLC, and seeks that the Court (1) declare that Plaintiff is entitled to a sale commission from Defendant, JNG Holdings, LLC, if the Premises is sold, whether to Liu and/or his affiliate; and (2) order any and all relief that this Court deems appropriate.

**COUNT VIII – PIERCING THE CORPORATE VEIL**
**PLAINTIFF V. DEFENDANTS, MOHAMMAD AWAD AND JAMAL AWAD**

104. Plaintiff incorporates by reference averments 1 through 103 set forth above as if same were fully set forth at length herein.

105. For all times relevant hereto, Plaintiff worked closely with Jamal and Mohammad to secure a purchaser for the Premises both when the Premises was owned by Pavlis and when it was transferred to JNG.

106. Jamal was Pavlis's power of attorney and always assisted Pavlis with the management of Pavlis's real estate, such as the Premises, and Jamal and Mohammad have both been Plaintiff's main contacts relative to the Exclusive Right to Sell Agreement.

107. Jamal and Mohammad are both fully aware of JNG's obligations to Plaintiff.

108. Jamal was also signatory for Pavlis on some of the agreements between Pavlis and Plaintiff.

109. Jamal and Mohammad, upon information and belief, transferred the Premises from Pavlis to JNG to attempt to avoid the responsibility to pay Plaintiff for commissions.

110. Upon information and belief, Jamal and Mohammad are the sole owners and/or members of JNG.

111. Jamal and Mohammad, at all times relevant hereto, misused the corporate structure to perpetrate a fraud upon Plaintiff, as set forth previously herein and have directly participated in such fraud in their individual capacities.

112. As a result of the misuse of the corporate structure of JNG, the corporate veil should be pierced to impose personal liability on the individual Defendants, Jamal and Mohammad.

113. Upon information and belief, the Premises is JNG's sole asset.

114. If the Premises is sold, based upon Liu's assertion that it was sold to a Maryland company, then JNG would have no more assets.

115. Therefore, an injustice would result if the corporate veil were not pierced to hold Mohammad and Jamal personally liable for JNG's actions and inactions with respect to failure to pay Plaintiff commissions.

116. An injustice would result if the corporate veil were not pierced to hold Mohammad and Jamal personally liable for JNG's actions and inactions with respect to failure to pay Plaintiff commissions, because if the Premises is transferred before the lawsuit is concluded,

JNG will have no further assets.[3]

WHEREFORE, Plaintiff, Mertz Corporation d/b/a NAI Mertz Corporation, demands judgment in its favor and against Defendants, Mohammad Awad and Jamal Awad, jointly and severally, for an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), and attorney fees and costs incurred in connection with its collection efforts, together with interest and costs.

**COUNT IX –TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**
**PLAINTIFF V. DE RONG LIU A/K/A DERONG LIU A/K/A TOMMY LIU**

117. Plaintiff incorporates by reference averments 1 to 116 set forth above as if same were fully set forth at length herein.

118. Plaintiff and Pavlis entered into the Exclusive Right to Sell Agreement, which was amended twice. *See* Exhibits "A" through "C."

119. JNG was Pavlis's successor and thus was bound to the Exclusive Right to Sell Agreement as an "Owner" in accordance with Section 3 of the Exclusive Right to Sell Agreement. *See* Exhibit "A."

120. JNG had a duty to act in good faith and deal fairly with Plaintiff in the performance of the Exclusive Right to Sell Agreement.

121. Plaintiff procured Liu as a ready, willing and able buyer to purchase the Premises from JNG, and thus, JNG was legally obligated to pay to Plaintiff a commission.

122. This transaction and future partnership between Liu and the JNG Defendants were highly publicized as the Premises was a long-time fixture in the community. *See* Exhibit "F."

---

[3] There was never an estate raised for Pavlis. All of Pavlis's assets were transferred to Jamal and/or JNG prior to Pavlis's death. Any claim against Pavlis's Estate would be futile.

123. Liu was aware of the Exclusive Right to Sell Agreement, by and through his introduction to the Premises by Plaintiff and as evidenced by the Letter of Intent and draft Agreement of Sale. *See* Exhibits "D" and "E."

124. At all relevant times, Lui intentionally committed overt acts to interfere with the Exclusive Right to Sell Agreement, including, but not limited to:

a. Failing to respond to Plaintiff's requests for an executed Letter of Intent and Agreement of Sale;

b. Failing to close on the sale of the Premises, and instead, entering into a lease;

c. Failing to provide Plaintiff with a lease between Liu and JNG;

d. Representing that he no longer had a relationship with the JNG Defendants and was no longer involved with the Premises, other than the performance of certain building renovations, despite that representation not being supported by the public record;

e. Representing that JNG sold the Premises to a Maryland Company, despite that representation also not being supported by the public record;

f. Structuring or characterizing the transaction in a manner intended to circumvent the Exclusive Right to Sell Agreement and deprive Plaintiff of commissions;

g. Concealing from Plaintiff material facts concerning the nature, timing, or terms of the transaction; and

h. Completing the transfer of the Premises while intentionally excluding Plaintiff from the transaction.

125. Liu's actions constitute an intentional interference with Plaintiff's contractual rights under the Exclusive Right to Sell Agreement and were undertaken without privilege,

justification, or excuse.

126. Liu's purpose was to deprive Plaintiff of its earned commission and to evade JNG's contractual obligations under the Exclusive Right to Sell Agreement.

127. As a result of Liu's interference, Plaintiff sustained damages.

128. The aforesaid interference of Liu was outrageous, willful, wanton, reckless, malicious, oppressive, egregious, and illegal, warranting the imposition of punitive damages in addition to compensatory damages.

WHEREFORE, Plaintiff, Mertz Corporation d/b/a NAI Mertz Corporation, demands judgment in its favor and against Defendant, De Rong Liu a/k/a Derong Liu a/k/a Tommy Liu, for an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), punitive damages, and attorney fees and costs incurred in connection with its collection efforts, together with interest and costs.

**COUNT X –CIVIL CONSPIRACY**
**PLAINTIFF V. ALL DEFENDANTS**

129. Plaintiff incorporates by reference averments 1 to 128 set forth above as if same were fully set forth at length herein.

130. Plaintiff and Pavlis entered into the Exclusive Right to Sell Agreement, which was amended twice. *See* Exhibits "A" through "C."

131. JNG was Pavlis's successor and thus was bound to the Exclusive Right to Sell Agreement as an "Owner" in accordance with Section 3 of the Exclusive Right to Sell Agreement. *See* Exhibit "A."

132. JNG had a duty to act in good faith and deal fairly with Plaintiff in the performance of the Exclusive Right to Sell Agreement.

133. Plaintiff procured Liu as a ready, willing and able buyer to purchase the Premises from JNG, and thus, JNG was legally obligated to pay to Plaintiff a commission.

134. This transaction and future partnership between Liu and the JNG Defendants were highly publicized as the Premises was a long-time fixture in the community. *See* Exhibit "F."

135. Liu was aware of the Exclusive Right to Sell Agreement, by and through his introduction to the Premises by Plaintiff and as evidenced by the Letter of Intent and draft Agreement of Sale. *See* Exhibits "D" and "E."

136. At all relevant times, the JNG Defendants and Liu knowingly agreed and acted in concert to interfere with Plaintiff's contractual right to earn a sale commission under the Exclusive Right to Sell Agreement. *See* Exhibit "A."

137. The object of the agreement between JNG Defendants and Liu was to deprive Plaintiff of the commission that had been earned after Plaintiff procured a reading, willing, and able purchaser, while preserving the economic benefits of the transaction between Defendants.

138. In furtherance of the conspiracy, Defendants committed overt acts to interfere with the Exclusive Right to Sell Agreement, including, but not limited to:

i. Failing to respond to Plaintiff's requests for an executed Letter of Intent and Agreement of Sale;

j. Failing to close on the sale of the Premises, and instead, entering into a lease;

k. Failing to provide Plaintiff with a lease between Liu and JNG;

l. Liu representing that he no longer had a relationship with the JNG Defendants and was no longer involved with the Premises, other than the performance of certain building renovations, despite that representation not being supported by the public record;

m. Liu representing that JNG sold the Premises to a Maryland Company, despite that representation also not being supported by the public record;

n. Structuring or characterizing the transaction in a manner intended to circumvent the Exclusive Right to Sell Agreement and deprive Plaintiff of commissions;

o. Concealing from Plaintiff material facts concerning the nature, timing, or terms of the transaction; and

p. Completing the transfer of the Premises while intentionally excluding Plaintiff from the transaction.

139. Defendants' concerted actions constitute an intentional interference with Plaintiff's contractual rights under the Exclusive Right to Sell Agreement and were undertaken without privilege, justification, or excuse.

140. The conspiracy's unlawful objective was accomplished through Liu's commission of tortious interference with contractual relations.

141. Defendants acted with malice, as their purpose was to deprive Plaintiff of its earned commission and to evade JNG's contractual obligations under the Exclusive Right to Sell Agreement.

142. It remains clear that Liu and the JNG Defendants remain partners with regard to this transaction and the Premises and are working together by taking actions to actively prevent Plaintiff from collecting its earned commission.

143. As a result of Defendants' civil conspiracy, Plaintiff sustained damages.

144. The aforesaid conspiracy of Defendants was outrageous, willful, wanton, reckless, malicious, oppressive, egregious, and illegal, warranting the imposition of punitive damages in addition to compensatory damages.

WHEREFORE, Plaintiff, Mertz Corporation d/b/a NAI Mertz Corporation, demands judgment in its favor and against Defendants, Mohammad Awad, Jamal Awad, JNG Holdings LLC, and De Rong Liu a/k/a Derong Liu a/k/a Tommy Liu, jointly and severally, for an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), punitive damages, and attorney fees and costs incurred in connection with its collection efforts, together with interest and costs.

**LIPSKY AND BRANDT**

**By:** /s/*Louis I. Lipsky*
**Louis I. Lipsky, Esquire**
**(PA Id. No. 46808)**
**Scott H. Brandt, Esquire**
**(PA ID No. 66566)**
**Rachel I. Freedman, Esquire**
**(PA ID No. 318510)**
**1101 Market Street, Suite 2520**
**Philadelphia, PA 19107**
**Telephone: (215) 922-6644**
**llipsky@lipskybrandt.com**
**sbrandt@lipskybrandt.com**
**rfreedman@lipskybrandt.com**
**Attorneys for Plaintiff**

**DATE: 8/18/2026**

## VERIFICATION

**BOBBI JEAN FORMOSA**, hereby states that she is an Executive Managing Director and Chief Operating Officer of the Plaintiff in this action, Mertz Corporation d/b/a NAI Mertz Corporation, and is authorized to take this Verification on behalf of the Plaintiff and verifies that the statements made in the foregoing **PLAINTIFF'S COMPLAINT** are true and correct to the best of her knowledge, information and belief. The undersigned understands that the statements herein are made subject to the penalties of 18 PA. C.S. § 4904, relating to unsworn falsification to authorities.

August 18, 2026
**DATE**

**BOBBI JEAN FORMOSA**

# EXHIBIT "A"

tel 215 396 2900
fax 856 234 4957
www.naimertz.com
210 East Street Road, Suite 3B
Feasterville-Trevose, PA 19053

NAI Mertz
Commercial Real Estate Services, Worldwide.

## EXCLUSIVE RIGHT TO SELL AGREEMENT

I, George S. Pavlis, the owner of the property listed below ("Owner"), hereby grant to you, NAI Mertz Corporation, ("Broker") the exclusive right to sell the below mentioned property, subject to the following provisions:

1. <u>TERMS AND PRICES</u>

In consideration of Broker's promise to list for sale and endeavor to secure a purchaser for Owner's properties located 1858 Street Road, Bensalem, PA 19020 (the "Premises") for a sale price of $21,000,000, or at such other price and on such terms as may be acceptable to Owner, Owner hereby grants to Broker the sole and exclusive right to sell the Premises during the term (as hereinafter defined) of this Agreement. The term ("Term") of this Agreement shall commence upon full execution and will expire one (1) year thereafter.

2. <u>SALES COMMISSION</u>

Owner agrees that upon a sale (or exchange) of the Premises, or any portion of the Premises, at any time during the Term, Broker shall have and is hereby given the exclusive right to negotiate such sale (or exchange) and regardless of who may negotiate the same, Owner shall pay to Broker a commission of three & three-quarters percent (3.75%) of the gross sale price (or of the market value of the consideration received by the Owner in an exchange) of the Premises ("Sales Commission") whether the buyer be any entity including a governmental authority by negotiation or condemnation. For purposes of this paragraph, if the Premises constitute substantially all the assets of a corporation, or other entity, a sale or exchange of the stock or other interest in such corporation or entity shall be deemed a "sale or exchange of the Premises" under this Agreement. The Sales Commission shall be due and payable upon closing of titles to the Premises, as long as the Agreement of Sale was executed during the Term. For purposes of this Agreement, "Buyer" shall include any individual or entity introduced to Premises during Term who enters into a sale or exchange of Premises, including (i) any of Buyer's parent, subsidiary or sister corporations and any other corporation ("Affiliated Corporation") which is controlled by any principals ("Controlling Person") having a controlling interest in Buyer, whether individually or as a group (ii) any partnership, joint venture, or trust in which Buyer, an affiliated Corporation or any Controlling Person has a controlling interest and (iii) heirs, executors, administrators, successors and assigns of Buyer. Buyer's broker will seek any compensation from their buyer.

3. <u>OWNER AFFILIATES</u>

For purposes of this Agreement, "Owner" shall be deemed to include (a) any of Owner's parent, subsidiary or sister corporations and any other corporation ("Affiliated Corporation") which is controlled by any principals ("Controlling Person") having a controlling interest in Owner, whether individually or as a group (b) any partnership, joint venture, or trust in which Owner, an Affiliated Corporation or any Controlling Person has a controlling interest and (c) heirs, executors, administrators, successors and assigns of Owner.

4. <u>ESCROW MONEY</u>

The Owner is hereby notified and understands that all payments on account of any transaction or transactions under this Agreement or any extension thereof shall be retained in escrow for the benefit of the parties of this transaction in accordance with the Real Estate Licensing Law of the Commonwealth of Pennsylvania.

5. <u>DEFAULT</u>

Owner agrees to pay to Broker the Sales Commission at settlement by Title Company funds, cash or federal wire transfer. In the event, however, the buyer defaults in buyer's obligations to purchase the Premises so that settlement does not occur, Owner shall pay to Broker twenty-five percent (25%) of all monies collected by Owner, including any deposit funds retained by Owner and/or funds representing liquidated damages, which sum shall not exceed the Sales Commission. Owner also agreed to extend Broker's listing agreement by an additional six (6) months. In the event Owner defaults in Owner's obligations to sell the Premises so that settlement does not occur, Broker shall nonetheless be entitled to the full Sales Commission.

6. LEASING COMMISSION

(a) Even though it is not intent of the Owner to lease the Premises or any part of the Premises or to have improvements constructed on the Premises, should a lease be entered into between Owner and another party or entity ("Tenant") for the Premises and/or improvements on the Premises during the term of this Agreement, then Owner shall pay to Broker a leasing commission of six percent (6%) of gross rents to be paid to Owner under the Lease ("Leasing Commission"). The Leasing Commission shall be earned, due and payable upon execution of the Lease by both Owner and the Tenant and the payment of the first month's rent under the Lease. Owner agrees to insert a paragraph in the lease stating that Mertz Corporation is the Broker of record pertaining to the lease.

(b) In the event a Tenant continues its tenancy at the Premises after the expiration of the original term ("Original Term") of the Lease, whether pursuant to a renewal, extension, renegotiation of any kind or new lease agreement for the Premises, ("Extended Term"), Owner shall pay to Broker a commission which shall be calculated on the basis of the commission rate set forth in subparagraph (a) of this paragraph 6, and as though the Extended Term had been a part of the Original Term up to the total term (including the Original Term) of the Tenant's right to possession. In addition, if during the Original Term or Extended Term, the Tenant leases additional space at the Premises from the Owner, Owner shall pay to Broker a commission in the amount of four percent (4%) of the gross rents to be paid to Owner under the renewal, extension, renegotiation or new lease agreement providing for such additional space. Commissions for any Extended Term and/or for additional space rented at the Premises shall be earned, due and payable upon execution of the renewal, extension, expansion or new lease agreement (as the case may be) by both Owner and the Tenant and the payment of the first month's rent under the Lease.

(c) In the event Owner sells (or exchanges) the Premises or any portion of the Premises to Tenant ("Tenant") procured by Broker, Owner shall pay to Broker a sales commission of three & three-quarters percent (3.75%) of the gross sale price or of the market value of the consideration received by the Owner in such exchange of the Premises. For purposes of this Agreement, "Tenant" shall include (i) any of Tenant's parent, subsidiary or sister corporations and any other corporation ("Affiliated Corporation") which is controlled by any principals ("Controlling Person") having a controlling interest in Tenant, whether individually or as a group (ii) any partnership, joint venture, or trust in which Tenant, an affiliated Corporation or any Controlling Person has a controlling interest and (iii) heirs, executors, administrators, successors and assigns of Tenant.

7. SALE OF IMPROVEMENTS ON THE PREMISES

In the event Owner sells improvements that have been constructed on the Premises, Owner shall pay to Broker a commission of three & three-quarters percent (3.75%) of the sale price of such improvements.

8. SALE OR LEASE AFTER TERMINATION

(a) In the event any person, corporation, partnership or other entity who, during the Term, has been shown the Premises or has made an offer to purchase or lease the Premises ("Prospective Purchaser or Tenant") enters into a contract to purchase or lease the Premises within twelve (12) months of the expiration of the Term, Owner shall pay to Broker the Sales Commission or Leasing Commission, as the case may be.

(b) If Owner does not enter into an exclusive listing agreement with another broker after the expiration of this Agreement, and permits Broker to continue to bring new prospects to the Premises, should a contract to purchase or lease be entered into by the Owner and new Prospect within one (1) year of the Prospects' being shown the Premises, Owner agrees to pay to Broker a Commission as per Sections 2 & 6 of this Agreement.

9. FINANCIAL CONDITION OF PURCHASER/TENANT

Owner represents and covenants that Owner shall make its own investigation of the financial condition of all Prospective Purchasers and Tenants of the Premises and Owner does not rely on any representations of Broker as to any aspect of Purchaser's or Tenant's creditworthiness. Although Owner agrees to pay to Broker all Sales Commissions due to Broker out of the proceeds of settlement upon the sale or exchange of the Premises, Broker's right to a Sales Commission under this Agreement shall not be conditioned upon the payment of any funds to Owner under any purchase money mortgage, or otherwise. Similarly, Broker's right

to any Leasi[illegible] Tenant under any lease.

10. ADVERTISING

Owner agrees to pay upon Broker's request up to but not in excess of __-0-__ Dollars ($__-0-__) for promotional and advertising expenses.

11. SIGNAGE, COOPERATION AND INTERNET

Broker is authorized to place a "Sale" or "Available" or other sign with similar verbiage upon the Premises and it is agreed that no other sign will be displayed during the Term. ~~Owner agrees to pay up to but not in excess of six hundred and sixty dollars ($660.00) plus tax, for the creation, installation and eventual removal of a 4' x 6' double-sided sign, or five hundred and forty dollars ($540.00) plus tax for a 4' x 4' double-sided sign.~~ The size of the sign shall be at the Owner's discretion. Owner agrees to assist and fully cooperate in the sale or lease of the Premises and grants Broker the right to advertise the Premises on the internet. Broker is hereby authorized by Owner to publicize any transaction that arises out of this Agreement or Broker's representation of Owner. Broker will not install a sign at the Premises until Owner requests same.

12. CONDITION OF PREMISES

(a) Owner acknowledges and agrees that the Broker, a licensed real estate broker, is not an expert in construction, engineering, environmental or legal matters, nor is being asked to, nor will, make any representations or warranties respecting the condition, including but not limited to the environmental condition or suitability of the Premises;

(b) Owner agrees to disclose in writing to Broker and to Prospective Purchasers and/or Tenants any and all information which the Owner has regarding the condition of the Premises, including but not limited to the presence of asbestos, radon, PCB transformers, other toxic, hazardous or contaminating substances and underground storage tanks, in, on, under or migrating from or to the Premises;

(c) Owner agrees to indemnify, defend and hold the Broker harmless from and against any and all claims, demands or liability, including liability for attorney's fees and court costs made against Broker arising from or related to: (1) the failure of Owner to make a full, complete and accurate disclosure to Broker and to Prospective Purchasers and/or Tenants arising from or related to the condition or suitability of the Premises; (2) the environmental condition of the Premises or the existence, use or discharge on the Premises of any toxic or hazardous substances; (3) any building, safety, environmental protection, zoning, environmental law, or other law, regulation, rule or other legal requirement affecting the Premises; (4) any disputes or litigation arising between Owner and any prospective or actual Tenant or Purchaser of the Premises; and (5) any injury or loss suffered by a prospective purchaser or tenant while being shown the Premises by the Broker or its agents. The provisions of this paragraph shall survive the termination of this Agreement.

13. PENNSYLVANIA

The following disclosure is provided here in compliance with the Real Estate Licensing and Registration Act of 1984.

**Before signing this Agreement, we have told you that our commission and the listing period have been determined as a result of negotiation between us. The Agent will earn a commission upon the Premises' sale or lease, regardless of whom, including the Owner, makes the sale or lease during the listing periods.**

**The Owner is hereby notified and understands that the Commonwealth of Pennsylvania has established a Real Estate Recovery Fund from which an aggrieved person may under certain circumstances recover damages in the event such aggrieved person obtains a judgment against a person licensed under the Pennsylvania real Estate Licensing and Registration Act. For additional information, call the Pennsylvania real Estate Commission at (717) 783-3658.**

NAI Mertz

Owner Initials ______ Broker Initials ______

14. OWNER WARRANTY AND REFERRALS

(a) Owner represents and warrants to Broker that Owner holds good and marketable title to the Premises that all mortgages encumbering the Premises are in good standing and Owner has the ability to convey good and marketable title and to convey a leasehold interest in the Premises, as contemplated by this Agreement.

(b) Owner shall promptly refer to Broker, in writing, phone or email, all prospects who have expressed an interest in leasing or purchasing the Premises.

15. AUTHORIZATION OF OWNER

Owner represents and warrants that all corporate actions required to be taken (if Owner is a corporation) have been duly taken and that the persons executing this Agreement on behalf of Owner are duly authorized to execute this Agreement on behalf of and bind Owner.

16. LEGAL FEES AND INTEREST

(a) In the event Broker does not receive commissions due under this Agreement, Owner shall be responsible for all reasonable legal fees and related expenses incurred by Broker in collection of such commissions.

(b) Interest shall accrue and be due and owing on all monies owed pursuant to this Agreement from the due date to the date payment has been received by Broker at an annual rate equal to five percent (5%).

17. DUAL AGENCY

Owner agrees that Broker shall have the right to represent Prospective Purchasers or Tenants as well as the Owner, and consents to such dual representation.

18. BROKER CONFLICT

A conflict of interest is when a Broker has a financial or personal interest in the Premises of where Broker cannot put Owners' interests before any other. If the Broker, or any Brokers salespeople or agents, has a conflict of interest, Broker will notify Owner thereof in a timely manner.

19. COOPERATION

Broker agrees that the Broker may work with other brokers/sub-agents to secure a Purchaser/Tenant for the Premises. Owner reserves the right to reject any additional commissions.

20. COMPENSATION TO COOPERATING BROKER

In the event a Purchaser/Tenant is procured by another broker other than Broker, Broker reserves the right to negotiate any and all commissions sought by the cooperating broker, whether the transaction is a sale or lease.

21. EXTENT OF CONTRACT

This Agreement shall extend to and be binding upon the heirs, executors, administrators, successors, successors in title and assigns of the parties hereto. Upon execution of an Agreement of Sale this Agreement and all rights and obligations hereunder shall be automatically extended through the date of actual settlement or closing.

22. GOVERNING LAW

This Agreement shall be construed according to the laws of Pennsylvania.

23. VALIDITY OF FAXED SIGNATURES

This Agreement shall be effective when signed below or in counterpart, and photocopy, facsimile, electronic or other copies shall have the same effect for all purposes as an ink-signed original.

The parties agree that return of this Agreement and any addenda and amendments, including return by electronic transmission, bearing the signature of all parties, constitutes acceptance by the parties.

24. NOTICE TO PERSONS OFFERING TO SELL OR RENT REAL PROPERTY IN PENNSYLVANIA

Federal and state law make it illegal for Owner, Broker, or anyone to use race, color, religion or religious creed, sex, disability (physical or mental), familial status (children under 18 years of age), age (40 or older), national origin, use or handling/training of support or guide animals, or the fact of a relationship or association to an individual known to have a disability as reasons for refusing to sell, show or rent properties, loan money, or set deposit amounts, or as reasons for any decision relating to the sale of the Premises.

25. ENTIRE CONTRACT

This Agreement contains the entire contract between the parties and there are no related oral agreements or representations.

26. PARTIAL INVALIDITY

If any term, covenant or condition of this Agreement or the application thereof to any person, entity or circumstance will to any extent be invalid or unenforceable, the remainder of this Agreement or the application of such term, covenant or condition to persons, entities or circumstances other than those as to which it is held invalid or unenforceable will not be affected thereby and each term, covenant and condition of this Agreement will be valid and enforced to the fullest extent permitted by law.

27. NOTICES

All notices which may be required or desired to be given by either party hereto shall be given in writing may be sent electronically, by courier or by United States Postal Service to the other party as follows:

A. To the Owner: George S. Pavlis
1858 Street Road
Bensalem, PA 19020

B. To the Broker: MERTZ CORPORATION d/b/a NAI MERTZ CORPORATION
210 East Street Road- Suite 3B
Feasterville- Trevose, PA 19053
Attn: Jeff Licht, SIOR

28. Owner hereby acknowledges receipt of a fully executed copy of this Agreement.

OWNER: GEORGE S. PAVLIS

By: George S Pavlis
George S. Pavlis, Owner

BROKER: MERTZ CORPORATION d/b/a NAI MERTZ CORPORATION

By: [signature]
Jeffrey A. Licht, SIOR/Sr. Vice President

Accepted and agreed to this 3 day of August, 2022

witnessed by: [signature]

witnessed by: [signature]

Jamal Aw...

AMJAD TRABULSI

NAI Mertz

Owner Initials GP

Broker Initials [initials]

# EXHIBIT "B"

NAI Mertz
Commercial Real Estate Services, Worldwide

FIRST AMENDMENT TO EXCLUSIVE RIGHT TO SELL AGREEMENT

THIS FIRST AMENDMENT TO THE EXCLUSIVE RIGHT TO SELL AGREEMENT (this "Amendment") is made this 18th day of January 2023, to be effective upon execution of this First Amendment, between GEORGE S. PAVLIS ("Owner") and NAI MERTZ, a New Jersey corporation ("Broker").

WITNESSETH:

WHEREAS, Owner and Broker entered into that certain Exclusive Right to Sell Agreement dated August 3, 2022 (the "Agreement"), for property located at 1858 State Road, Bensalem PA 19020.

WHEREAS, the parties desire to amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, obligations and agreements contained herein, Owner and Broker hereby agree as follows:

1. Price Reduction. Owner and Broker agree that the asking sale price shall be reduced from $21,000,000 to $9,950,000.

2. Extension of Term. Owner and Broker agree that the Agreement is currently in full force and effect, and upon execution of this Amendment, the Term of the Agreement is extended until 11:59 PM March 12, 2024.

3. Ratification. Except as modified by this Amendment, the Agreement and all terms, conditions, covenants and agreements thereof shall remain in full force and effect and are hereby in all respects ratified and confirmed.

OWNER: GEORGE S. PAVLIS

By: ______________________
George S. Pavlis, Owner

BROKER: MERTZ CORPORATION d/b/a NAI MERTZ

By: ______________________
Jeffrey A. [illegible], SIOR, Executive VP & Managing Director

Accepted and agreed to this 13 day of [illegible], 2023

# EXHIBIT "C"

NAI Mertz
Commercial Real Estate Services, Worldwide

tel 215 396 2900
fax 856 234 4957
www.naimertz.com
210 East Street Road, Suite 3A
Feasterville-Trevose, PA 19053

SECOND AMENDMENT TO EXCLUSIVE RIGHT TO SELL AGREEMENT

THIS SECOND AMENDMENT TO THE EXCLUSIVE RIGHT TO SELL AGREEMENT (this "Amendment") is made this 12th day of March, 2024 to be effective March 12, 2024, between GEORGE S. PAVLIS ("Owner") and NAI MERTZ, a New Jersey corporation ("Broker").

WITNESSETH:

WHEREAS, Owner and Broker entered into that certain Exclusive Right to Sell Agreement dated August 3, 2022 which was further amended January 18, 2023 (the "Agreement"), for property located at 1858 Street Road, Bensalem PA 19020.

WHEREAS, the parties desire to amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, obligations and agreements contained herein, Owner and Broker hereby agree as follows:

1. Extension of Term. Owner and Broker agree that the Agreement is currently in full force and effect, and upon execution of this Amendment, the Term of the Agreement is extended until 11:59 PM December 31, 2024.

2. Ratification. Except as modified by this Amendment, the Agreement and all terms, conditions, covenants and agreements thereof shall remain in full force and effect and are hereby in all respects ratified and confirmed.

OWNER: GEORGE S. PAVLIS

By: ______________________
George S. Pavlis, Owner

BROKER: MERTZ CORPORATION d/b/a NAI MERTZ

By: ______________________
Jeffrey A. Licht, SIOR, Executive VP &
Managing Director

# EXHIBIT "D"

NAI Mertz
Commercial Real Estate Services, Worldwide.

tel 215 396 2900
fax 215 396 9433
www.naimertz.com
1105 Industrial Highway
Southampton, PA 18966

Sent via email only

Jamal Awad
Mohammad Awad
Tommy Liu

Re: Letter of Intent to Purchase 1858 E. Street Road, Bensalem, PA

Gentlemen,

Thank you all for meeting with me earlier today to agree to the following terms and conditions for purchase of 1858 E Street Road in Bensalem, PA. If all are in agreement with recap below, I will forward same to Buyer's Counsel to draft the Agreement of Sale.

| | | |
|---|---|---|
| 1. | **Purchase Price:** | $8,500,000.00. This purchase price shall include the real estate, all fixtures, furnishings and equipment and the liquor license. |
| 2. | **Deposit:** | $100,000.00 initial deposit and an additional $400,000.00 deposit due at execution of an Agreement of Sale, balance shall be due in full at Closing. The deposit shall be promptly returned to the buyer if the buyer terminates the Agreement of Sale pursuant to the contingencies below. |
| 3. | **Settlement:** | To occur on or before December 15, 2024. |
| 4. | **Financing:** | There is no financing contingency. Buyer will pay Seller $3,500,000.00 at Closing with $500,000.00 already in Escrow and another $3,000,000.00. Seller will provide Buyer a $5,000,000 Purchase Money Mortgage for up to 5 years at 5% interest only. The payment will be due monthly with a balloon payment of $5,000,000 due in full on or before five years with no prepayment penalty. |
| 5. | **Property Inspection:** | This offer is contingent upon receipt of a satisfactory buyer-paid property inspection to be completed within thirty (30) days of a fully executed Agreement of Sale. |
| 6. | **Environmental:** | This offer is contingent upon receipt of a satisfactory buyer-paid Phase I environmental study to be completed within thirty (30) days of a fully executed Agreement of Sale. Buyer requests any reports previously secured by ownership. |
| 7. | **Title:** | Shall be delivered at time of final settlement as clear and marketable. |

| | | |
|---|---|---|
| 8. | **Use:** | This offer is contingent upon Buyer being able to use the property for restaurant. |
| 9. | **Condition of Property:** | Property to be delivered in broom swept condition. There shall be no outstanding Township violations at the property. |
| 10. | **Approval:** | This offer is contingent upon the execution of a mutually acceptable Agreement of Sale to the buyer, seller and their respective counsels. |
| 11. | **Brokerage:** | NAI Mertz is the sole real estate broker in this proposed transaction and will receive a commission payable on the gross sale price by Seller in full at Closing per a separate agreement. |
| 12. | **Expiration:** | This Letter of Intent, once fully executed, will provide Buyer exclusivity to purchase for 14 days for a mutually acceptable agreement of sale to be finalized. |

The above constitutes a letter of intent reflecting the current interest Tommy Liu and/or any affiliated entity, to purchase the subject property. It is specifically understood and agreed that no legal rights or obligations exist between either party involved until and only if an Agreement of Sale is executed.

This offer shall be effective when signed below or in counterpart, and photocopy, facsimile, electronic or other copies shall have the same effect for all purposes as an ink-signed original.

We look forward to your timely response to proceed toward draft agreement of sale.

Regards,

NAI MERTZ CORPORATION

Jeffrey A. Licht, SIOR, EVP & Managing Director

Cc: Jared Licht, NAI Mertz

Acknowledged, agreed and accepted this ____ day of ______, 2024 by:

Buyer: ______________________________ Seller: ______________________________

NAI Mertz

Please Print

Please Print

# EXHIBIT "E"

**AGREEMENT FOR PURCHASE**
**AND SALE OF REAL ESTATE**

**THIS AGREEMENT OF SALE** (the or this "**Agreement**") is made this_______ day of _______________, 2024 and entered into by and between **DERONG LIU** on behalf of an entity to be formed (hereinafter collectively referred to as "**Buyer**"), and <SELLER> a Pennsylvania limited partnership or owner of record (hereinafter collectively referred to as "**Seller**"). This Agreement shall not be effective until it has been executed by both parties ("**Effective Date**").

R E C I T A L:

Seller is the owner of a parcel of land with street address of **1858 Street Road, Bensalem, Pennsylvania**. Seller desires to sell, and Buyer desires to purchase, said property, upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual promises and agreements herein contained, intending to be legally bound, IT IS AGREED by and between the parties as follows:

**1. Property**. The property which is the subject matter of this Agreement consists of the following:

(a) Real Property. All that certain lot or tract of land located in the city of Bensalem, Commonwealth of Pennsylvania, having street addresses of **1858 Street Road, Bensalem, Pennsylvania**, with a Parcel No. 02-043-095 as more particularly described on Exhibit "A" attached hereto and made a part hereof (the "**Land**"), together with all of Seller's right, title and interest in and to all buildings, structures, fixtures, and other improvements located on the Land (collectively, the "**Improvements**" and together with the Land, shall be referred to as the "**Real Property**").

(b) Omitted.

(c) Personal Property. Seller is the owner of certain personal property located in, at or on or used exclusively in connection with the Real Property, including without limitation: (i) all fixtures, machinery, equipment, furnishings, appliances; (ii) all fittings, heating, air cooling, air conditioning, freezing, lighting, incinerating and power equipment and apparatus; (iii) all engines pipes, pumps, tanks motors, conduits, switch boards, plumbing, lifting, cleaning, fire prevention, fire extinguishing, equipment and apparatus; (iv) all furnaces, oil burners or units thereof; and (v) all appliances, systems, awnings, screens, storm doors and windows, cabinets, partitions, ducts and compressors, furniture and furnishings, hot water heaters, garbage receptacles and containers above and below ground and articles of a nature similar to the foregoing; (vi) all tables, chairs, kitchen equipment, supplies and other items used at the Real Property; and all other personal property now upon or hereafter placed in, at or on the Real Property which are used in connection with the operation of the Real Property and owned by Seller, and all warranties and guarantees to and right of action of Seller therefor (collectively, "**Personal Property**").

(d) Appurtenances. All easements and appurtenances benefiting the Real Property or the Improvements, together with all right, title and interest of Seller in and to any land lying in the bed of any street, opened or proposed, abutting such tract of land (collectively, the "**Appurtenances**").

(e) Licenses and Permits. All of Seller's right, title and interest, if any, in and to any licenses and permits used in the operation of the Property (collectively, the "**Licenses and Permits**"), to the extent assignable. For purposes of this Agreement, the liquor license related to the operation of the Real Property shall not be considered part of the Licenses and Permits.

(f) The following property, to the extent it is assignable: (i) the right to receive insurance proceeds payable at or after the date of Closing (as hereinafter defined in Section 4) for losses or casualties which occur subsequent to the Effective Date and which are not repaired or remedied by Seller prior to Closing (as hereinafter defined in Section 4); and (ii) the right to receive an award resulting from any taking which is paid subsequent to the Closing. (Collectively, the "**Intangible Property**").

(g) The Real Property, Personal Property, Appurtenances, Licenses and Permits and Intangible Property shall collectively be referred to herein as the "**Property**".

(h) Condition of the Property. Buyer is purchasing the Property "As Is" and subject to all faults. Buyer acknowledges that it is not relying on any representation made by Seller or any agent or employee of Seller, but to the contrary is purchasing the Property based solely upon its own inspection of the Property.

2. **Sale and Purchase Price.**

(a) Seller hereby agrees to sell and convey to Buyer, who hereby agrees to buy, the Property identified in Paragraph 1 above, for the purchase price of **Eight Million Two Hundred Thousand and 00/100 Dollars** ($8,200,000.00) in the following manner, with all payments made by Bank Check, Title Company Check or wire transfer in immediately available funds ("**Purchase Price**"), which shall be paid by Buyer to Seller according to the following schedule:

(i) Deposit. The sum of Five Hundred Thousand and 00/100 Dollars ($500,000.00) ("**Deposit**") shall be deposited with Buyer's title insurance company, Neshaminy Abstract (the "**Title Company**") on behalf of Buyer within three (3) business days after a fully executed copy of this Agreement is returned to Buyer. The Deposit shall become nonrefundable at the close of business on the last day of the Inspection Period unless this Agreement is terminated prior to the expiration of the Inspection Period. The Deposit shall be applied to the purchase price or retained by a party in the event of a default by the other party pursuant to the terms of this Agreement.

(ii) Cash at Closing. Two Million Seven Hundred Thousand and 00/100 Dollars ($2,700,000.00), subject to the adjustments and credits provided for in this Agreement, shall be paid by Buyer at Closing. Buyer shall convey the Balance of the Purchase Price by wire transfer or by bank or title company check.

(iii) Seller's Note. The balance of Five Million and 00/100 Dollars ($5,000,000.00) shall be payable in the form of a Promissory Note at Closing, to be secured by a first lien Mortgage on the Real Property. (NEED TO ADD TERMS.)

3. **Inspection Period.**

(a) Within five (5) business days following the Effective Date, Seller shall deliver the Seller's Documents (hereinafter defined) to Buyer. As used herein, the term "**Seller's Documents**" shall include the following documentation relating to the Property (but only to the extent they are presently in Seller's possession or are readily available to Seller); (i) copies of any plans and surveys of the Property, (ii) prior title reports, (iii) legal descriptions, (iv) environmental studies including any Phase I conducted by Seller when it purchased the Property or when it obtained commercial financing, (v) service contracts, (vi) utility company agreements, (vii) property insurance appraisals and reports, (viii) easements, rights-of-way and liens on the Property, (ix) all zoning information relating to the Property, (x) accurate and compliant building plans related to the Property, and (xi) all contracts with customers of Seller for future events.

(b) Buyer shall have a period (the "**Inspection Period**") which Inspection Period shall commence upon the first business day following the date of Buyer's receipt of Seller's Documents set forth in Paragraph 3(a) above and shall expire at 5:00 p.m. on the thirtieth (30th) day thereafter, provided however, in the event such thirtieth (30th) day shall not be a regular business day, the intended expiration date shall occur on the next regular business day thereafter (such date is herein referred to as the "**Inspection Period Expiration Date**"). During the Inspection Period, Buyer shall have, at Buyer's sole cost, the right to perform a physical, structural, environmental and mechanical inspections of the Property, and an inspection of all pertinent contracts, documents, zoning, proposed building plans, relevant correspondence, books and records and financial information pertaining to the Property and Seller's business, as may be in Seller's possession, as well as to perform any such other inspections, tests, studies and investigations as Buyer shall reasonably determine to be appropriate. Seller shall cooperate with Buyer, at no cost to Seller, and shall furnish to Buyer such information, materials and documents as Buyer may reasonably request, and as may be in Seller's possession, in order to assist Buyer in Buyer's inspection and review.

(c) The inspection of the Property's operation, condition and maintenance shall include, without limitation, such environmental, physical, structural, mechanical and engineering inspections, tests, studies, investigations, reviews and assessments ("**Diligence Reports**") that Buyer deems appropriate; provided, however, that Buyer may not perform any invasive testing without first obtaining the Seller's written consent thereto, which consent shall not be unreasonably delayed or withheld.

(d) Buyer shall have full access to the Property to perform such investigations and shall endeavor to give Seller or Seller's representative reasonable prior notice of such access. Buyer agrees that it shall not unreasonably interfere with any occupancy of tenants in performing Buyer's inspection.

(e) Buyer shall indemnify, defend and hold harmless the Seller from and against any losses, claims and damages (including, without limitation, any property damage or personal or bodily injury, and reasonable attorney's fees) arising from Buyer's due diligence activities at the Real Property. This indemnification obligation shall survive the expiration or termination of this Agreement. Following any entry or investigations, Buyer shall promptly restore and repair any damage caused by such entry or investigations so that the Real Property shall be substantially in the same condition that existed in prior to such entry or investigations. Buyer shall be liable for all damages or injuries to any person or property resulting from Buyer's entry onto the Real Property, whether occasioned by the acts of Buyer or Buyer's employees, agents, partners, investors, consultants, contractors or subcontractors (collectively, "**Buyer's Agents**"). Neither Seller nor any agent, officer, director, shareholder, member, employee, contractor, affiliate or consultant of Seller shall be liable for any loss, damage or injury of any kind to any person or property to the extent arising from any access to or use of the Real Property by Buyer or Buyer's Agents, or caused by or arising from any act or omission of Buyer or Buyer's Agents in connection with Buyer's inspections. Prior to entering the Real Property, Buyer shall secure, maintain throughout the term hereof, and furnish a certificate thereof to Seller, a commercial general liability insurance policy with a single combined limit per occurrence of at least $1,000,000.00, insuring against liability arising out of or in connection with activities permitted under this Section 3 on the Real Property. Seller shall be named a certificate holder and additional insured on such policy.

(f) If Buyer determines, in Buyer's sole and absolute discretion, that Buyer does not wish to proceed with the transaction contemplated by this Agreement for reason of any of the inspections, Buyer shall so inform Seller in writing on or before the close of the Inspection Period Expiration Date, whereupon Seller and Buyer shall direct the Title Company to promptly refund the Deposit to Buyer. Upon completion of such refunding, this Agreement shall be terminated, and the parties hereto shall be relieved of all further obligations and liability under this Agreement, except for any obligations hereunder that may specifically be provided to survive the termination of this Agreement. If Buyer does not inform Seller in writing of the termination prior to the close of the Inspection Period Expiration Date, the Deposit shall be nonrefundable.

**4.** **Closing.** "**Closing**" under this Agreement shall be no later than December 15, 2024 ("**Closing Date**") at the office of Arangio & George, LLP, 2000 Market Street, Suite 1440, Philadelphia, PA or at such other place as the parties shall agree in writing. The parties may elect to conduct Closing by providing all documentation to the Title Company in advance of the Closing Date.

5. **Title.**

(a) Title to Property. At Closing, title to the Property shall be good and marketable and free and clear of all liens, encumbrances, easements, restrictions and title objections and insurable as such at ordinary rates by a title insurance company selected by Buyer (the "**Title Company**") subject only to (i) Acts of Assembly and local ordinances, and such easements, restrictions, easements for abutting streets and privileges or rights of or for utilities as do not interfere with the current use of the Property; (ii) zoning and similar laws, codes and ordinances; (iii) easements or claims of easements not shown by public records, (iv) discrepancies, conflicts in boundary lines, shortage in area, encroachments and any items which an accurate survey and inspection of the Property would disclose; and (v) the Permitted Title Exceptions (as hereinafter defined in Section 5) (collectively, the "**Title Exceptions**").

(b) Within ten (10) days of the Effective Date, Buyer shall, at Buyer's expense, order a title insurance commitment for an owner's policy of title insurance for the Property ("**Buyer's Title Commitment**"). Seller shall be obligated at Closing to cause the release of all mortgages secured by the Property and shall either discharge or indemnify the Title Company (to the commercially reasonable satisfaction of the Title Company) from loss arising from any judgment, mechanics lien (other than liens caused by Buyer's activities), taxes or monetary lien of fixed or ascertainable amount encumbering the Property resulting from acts or omission by Seller. The premium for the Owner's Policy of Title Insurance will be paid by Buyer.

(c) Inability to Convey. If Seller is unable to convey title to the Property to Buyer at Closing in accordance with the requirements of this Agreement, Buyer shall, as its sole and exclusive remedy, have the options (i) of taking such title as Seller is able to convey without abatement of the purchase price (except to the extent of monetary liens of fixed or ascertainable amount), or (ii) of terminating Buyer's obligations under this Agreement and Buyer shall be repaid the Deposit paid or deposited on account of the purchase price, whereupon neither party shall have any further rights, duties or obligations under this Agreement. If Buyer terminates this Agreement in accordance with this Paragraph 5(c), Seller and Buyer shall immediately deliver to Title Company written instructions to pay the Deposit to Buyer.

(d) Title to the Real Property as described herein shall be conveyed by Seller to Buyer at Closing by Seller's special warranty deed, duly executed, acknowledged and otherwise in proper statutory form for recording ("**Deed**").

(e) Seller's interest in the Licenses and Permits shall be conveyed from Seller to Buyer at Closing by assignment, prepared by Buyer at Buyer's expense, duly executed and in form and content sufficient to transfer, assign and convey to Buyer all of Seller's right, title and interest in and to the Intangible Property (the "**Licenses and Permit Assignment**").

6. **Time of the Essence**. All times provided for in this Agreement are and shall be of the essence. In computing the number of days for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays and holidays; provided, however, that if the final day of any

time period provided in this Agreement shall end on a Saturday, Sunday or legal holiday, then the final day shall extend to 5:00 p.m. of the next full business day. For the purposes of this Section, the term "holiday" shall mean a day other than a Saturday or Sunday on which banks in the state in which the Property is located are closed.

7. **Seller's Representations and Warranties**. To induce Buyer to enter into this Agreement, Seller makes the following representations, warranties and covenants to the best of his knowledge information and belief as of the Effective Date and through and including Closing:

(a) Seller has fee simple title to the Property;

(b) Seller is a limited partnership organized and in good standing in the Commonwealth of Pennsylvania and has full power and lawful authority to enter into and carry out the terms and provisions of this Agreement and to execute and deliver all documents which are contemplated by this Agreement and all actions of Seller necessary to confer such power and authority upon the persons executing this Agreement and all documents which are contemplated by this Agreement on behalf of Seller have been, or by the Closing will have been, taken.

(c) Except as listed in Schedule 7(c), there is no action, suit or proceeding pending or, to the knowledge of Seller, threatened against or affecting Seller or against all or any portion of the Property, which is not covered by Seller's insurance or would result in a lien on the Property at Closing.

(d) There are no construction, management, leasing, service, equipment, supply, maintenance, concession or other contracts or agreements (written, formal or informal) affecting the Property that will survive Closing or that could be or become an obligation or liability binding upon Buyer after Closing, except as identified on Schedule 7(d) to this Agreement.

(e) To Seller's knowledge, there is no pending condemnation, eminent domain, or similar proceeding affecting all or any portion of the Property. Seller has not received any written notice of any of the same and has no knowledge that any such proceeding is contemplated.

(f) There are no proceedings for special assessments pending or record with respect to the Real Property. Seller has no actual knowledge of any proposed or contemplated assessment, other than those which would be issued in the normal course, such as a higher assessed value for the Real Property which would result in higher real estate taxes, or any work of a nature such that an assessment therefor may hereafter be levied with respect to the Property.

(g) Except for those violations detailed in Schedule 7(c), Seller has had no notice of a violation of, any zoning building, elevator, fire, plumbing or health code, laws, ordinances, statutes or regulations, and any laws, ordinances, statutes and regulations relating to pollution or environmental standards, in effect as of the date of Closing.

(h) The documents identified in Schedule 3(a) are accurate and true and correct

copies.

(i) Seller has no written collective bargaining or employment agreements, organized labor agreements, bonus, deferred compensation, pension, profit sharing, welfare or health benefits, 401K or retirement plan for any employee and/or any such plans are expressly excluded. Buyer shall have no obligation, liability or responsibility with respect to charges, salaries, vacation pay, fringe benefits or like items subsequent to Closing, nor with respect to any management or employment agreements with respect to the Property or Seller's business.

(j) Except for those agreements detailed in Schedule 7(d) to Seller's knowledge, there are no private unrecorded restrictions or agreements entered into by Seller that affect the uses which may be made of the Property, including, but not limited to, size or cost of buildings, limitations on use or restrictions in regard to heights of buildings, agreements to submit architectural plans to an association, community organization, or other group, provisions requiring improvements, or provisions requiring the joining with others in group actions.

(k) Except for any permitted title exceptions, Seller warrants that at the time of Closing, Title to the Property shall be free and clear of all liens, encumbrances, easements, restrictions and objections, except such privileges and rights of or for utilities as do not interfere with the present use of the Property and further exception for any liens placed on the Property by reason of any actions of Buyer.

(l) Seller is not a debtor in bankruptcy.

(m) Seller has not executed any other Agreement of Sale, Option Agreement or Right of First Refusal with respect to the Property that remains in effect.

(n) At Closing the Seller shall promptly provide written notice to Buyer of any change in the Representations and Warranties made in this Section. The representations and warranties shall not merge into the Deed and shall survive for one (1) year after the date of Closing.

8. **<u>Seller's Environmental Representations and Warranties</u>**. Seller hereby represents and warrants from the Effective Date through the date of Closing as follows:

(a) <u>Compliance with Law</u>. Seller represents and warrants that since Seller's acquisition of the Real Property it has not actually received any notice that the Property and/or Seller's conduct at the Property is not compliance with any statutes, ordinances, regulations, orders, and requirements of common law concerning (i) those activities, (ii) repairs or construction of any improvements, (iii) handling of any materials, (iv) discharges to the air, soil, surface water, or groundwater, and (v) storage, treatment, or disposal of any waste at or connected with any activity at the Property.

(b) <u>Underground Tanks</u>. Seller represents and warrants that it has not actually

received any notice that there are any underground tanks on the Property.

9. **Buyer's Representations, Warranties and Covenants**. Buyer hereby represents, warrants and covenants as follows:

(a) Buyer has full power and lawful authority to enter into and carry out the terms and provisions of this Agreement and to execute and deliver all documents which are described in this Agreement and all actions of Buyer necessary to confer such power and authority upon the persons executing this Agreement and all documents which are described in this Agreement on behalf of Buyer have been, or by the Closing will have been, taken.

(b) This Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

(c) There are no actions, proceedings or investigations pending or, to Buyer's actual knowledge, threatened against Buyer which would have a materially adverse effect on the transactions described herein.

(d) Buyer has the financial resources to close under the terms of this Agreement.

10. **Covenants of Seller**. Seller covenants and agrees that until Closing or termination of this Agreement, whichever occurs first, Seller shall:

(a) Operate the Property in substantially the same manner as heretofore, keep and maintain all improvements thereon in substantially the same conditions, except for ordinary wear and tear, and shall make no structural changes to the Property.

(b) Keep the Property insured against the same risks and in at least the same amounts as of the date of this Agreement, and for the benefit of Buyer and Seller. Insurance proceeds necessary to restore the Property to its prior condition shall be paid to Seller to be used for that purpose.

(c) Seller shall not execute or agree orally to any leases, or grant, permit or suffer modifications or renewals of any lease.

(d) Without the prior consent of Buyer, execute no agreements pertaining to the operation of the Property.

(e) Afford Buyer and its designees and employees, pursuant to Section 3(d), access to the Property at all reasonable times upon reasonable advance notice for the purpose of making such inspection, review or examination as Buyer may desire, provided the access does not disrupt the business being conducted at the Property.

(f) At least twenty (20) days prior to the date scheduled for Closing, and again at Closing, notify Buyer in writing of any material changes, additions or events then known to Seller which cause any material change, addition or deletion in any of said Exhibits. Seller warrants that all such Exhibits as so updated and made current and as supplemented by said notice shall be true and correct in all material respects as of the Closing date.

(g) Notify Buyer in writing of any material changes, additions or events then known to Seller which cause any material change to the Seller's representations and warranties. Additionally, Seller shall notify Buyer in writing upon Seller's actual knowledge of any violations, litigation, condemnation, casualty or any material, physical change to the Property.

(h) Comply in all material respects with all applicable laws, ordinances and regulations and the directives of all lawful public authorities with respect to the physical condition of the Property.

(i) Not convey or encumber the Property or any interest thereof.

11. **Closing Obligations of Seller**. At Closing, Seller shall deliver to Buyer the following:

(a) The Deed described in Paragraph 5(d) hereof;

(b) Keys to the Property, if any;

(c) An Assignment, together with the original copies of any Licenses and Permits and Intangible Property;

(d) All plans, specifications, surveys, maps, drawings, or other similar documents pertaining to the Property which Seller now has in its possession relating to the Property, which had not been previously delivered to Buyer.

(e) Such Title Affidavit, resolutions and certificates as the Title Company shall require to evidence the due authorization of the execution and performance of this Agreement and the documents to be delivered pursuant hereto.

(f) A Certificate dated as of the Closing Date which provides all of Seller's representations and warranties set forth in Sections 7 and 8 of this Agreement were, as of the Effective Date, and as of the Closing Date, true and correct in all material respects, with the same force and effect as if each such warranty and representation were made at Closing.

(g) Such other documents as may be required to be delivered by Seller under the terms of this Agreement, or to comply with any applicable law.

(h) A fully executed FIRPTA Certificate and any other documents required under the Foreign Investment in Real Property Act of 1980, as amended.

(i) A Bill of Sale and General Assignment in form attached as Schedule 11(i), assigning all of Seller's rights, title and interest in and to the Personal Property and the Intangible Property.

12. **Closing Obligations of Buyer**. At Closing, Buyer shall deliver to Seller the following:

(a) The Promissory Note, Mortgage, and any other related documents reasonably requested by Seller;

(b) The balance of the Purchase Price in immediately available funds.

(c) Such resolutions and certificates as the Title Company shall require evidencing the due authorization of the execution and performance of this Agreement and the documents to be delivered pursuant hereto.

(d) Such other documents as may be required to be delivered by Buyer under the terms of this Agreement.

(e) A Certificate dated as of the Closing Date which provides all of Buyer's representations and warranties set forth in Section 9 of this Agreement were, as of the Effective Date, and as of the Closing Date, true and correct in all material respects, with the same force and effect as if each such warranty and representation were made at Closing.

13. **Possession and Delivery of the Property**. At Closing, Seller shall deliver to Buyer physical possession of the Property.

14. **Closing Adjustments.**

(a) Seller shall be responsible for all real estate taxes, water rents, sewer rents and similar annual charges against the Property for all tax years preceding the year in which Closing is held and shall pay and discharge the same at or before Closing. All real estate taxes, water rents, sewer rents and similar annual charges for the current tax year in which Closing is held shall be apportioned between the parties as of the date of Closing on a per diem basis.

(b) Seller and Buyer shall each pay fifty percent (50%) of the total real estate transfer taxes assessed upon this transaction.

(c) If practicable, utility readings will be taken after 12:00 noon on the day prior to Closing, or before 12:00 noon on the date of Closing, and Seller shall pay the charges for utility services based on such reading. If readings are not so obtained apportionment can be based on the

last available bills. Buyer shall pay all such charges for utility services thereafter. Any required adjustments will promptly be made between Buyer and Seller in cash or good check. All other utility bills shall be apportioned as of the day of Closing.

15. **Governmental Assessments and Zoning**. Seller hereby represents and warrants as follows from the Effective Date through the date of Closing as follows:

(a) Seller represents and warrants to Buyer that as of the date of this Agreement and as of the date of Closing, Seller has no actual knowledge or actual notice of any work being done or about to be done, or of any assessment, violation or other notice issued or about to be issued by any federal, state, municipal or public body or authority, relating to, or with respect to or otherwise affecting the Property or abutting streets. Buyer after Closing agrees to undertake and pay for all work done or ordered to be done by or required in order to comply with the requirements of any federal, state, municipal or public body or authority, whether or not presently assessed or ordered to be done, on or with respect to or otherwise affecting the Property or abutting streets, or required in order to comply with any existing assessment, violation or similar notice. Notwithstanding the foregoing, Buyer shall not be required to pay for any fines or penalties levied on the Property prior to Closing.

(b) Seller represents and warrants (i) that the existing use of the Property is commercial, specifically retail and restaurant (ii) that the zoning classification of the Property under the applicable zoning ordinance is G-C General Commercial, (iii) that the zoning classification authorizes the use now being made of the Property and the use, location and construction of the buildings, structures and improvements as presently used, located and constructed thereon, and (iv) that such present use and building construction and location do not violate the zoning of any applicable subdivision ordinance. In the event the zoning classification of the Property is changed prior to Closing without Buyer's written approval, Buyer shall have the right to cancel this Agreement, whereupon Seller shall repay to Buyer all monies paid on account of the purchase price and neither party shall have any further rights, duties or obligations under this Agreement.

(c) Seller, at Seller's sole cost and expense, shall comply with the requirements of any and all notices relating to the Property which may be issued or may have been issued by municipal or other public authorities at any time prior to Closing.

16. **Conditions Precedent to Closing**.

(a) The obligation of Buyer to purchase the Property, and the obligations of Buyer hereunder, shall be subject to the fulfillment at or prior to Closing of each of the following conditions:

(i) Each of the representations and warranties of Seller shall be true and correct in all material respects both on the date hereof and at the time of Closing, except to the extent waived in writing by Buyer.

(ii) Seller shall have performed and complied in all material respects with all agreements, undertakings and obligations which are required to be performed or complied with by it at or prior to Closing, except to the extent waived by Buyer in writing.

(iii) Buyer shall have obtained approval for the use of the property as a restaurant.

(iv) Closing under Agreement of Sale of Liquor License between Buyer or its affiliated entity and Seller shall have occurred or shall occur contemporaneous with closing under this Agreement.

(b) The obligation of Seller to sell the Property, and the obligations of Seller hereunder, shall be subject to the fulfillment at or prior to Closing of each of the following conditions:

(i) Buyer shall have performed and complied in all material respects with all agreements, undertakings and obligations which are required to be performed or complied with by it at or prior to Closing, except to the extent waived by Seller in writing.

(ii) There shall be no law, ordinance or regulation enacted by any legislative or any administrative body, or decision, decree, judgment or finding by a court of law, which would affect, delay, prohibit the right of Seller to convey the Property to Buyer.

**17. Marketability**. Seller shall not be permitted to continue to market the Property for sale or lease to the public from the Effective Date through Closing unless this Agreement is terminated by Buyer as provided herein.

**18. Insurance and Risk of Loss.**

(a) Seller shall maintain fire and extended coverage insurance on the Property until Closing, in an amount not less than existing policies for the benefit of Buyer and Seller.

(b) Risk of Loss. If any of the Property is damaged or destroyed prior to the Closing, or condemnation proceedings are commenced against any of the Property, then Buyer shall have the right, at its election, either to terminate this Agreement in its entirety and to immediately receive Buyer's Deposit or to not terminate this Agreement and purchase the Property (or the portion not damaged or affected by condemnation, as the case may be) in which case this Agreement shall otherwise remain in full force and effect, and Buyer shall be entitled to any proceeds of insurance or condemnation awards. Buyer shall have thirty (30) days after Seller notifies Buyer in writing that such an event has occurred to make such election by delivery to Seller of a written election notice (the "**Election Notice**"). Buyer's failure to deliver the Election Notice within such thirty (30) business day period shall be deemed an election to terminate this Agreement in its entirety and to immediately receive Buyer's Deposit plus all accrued interest thereon.

(c) Repairs Prior to Closing. In the event of any casualty occurring prior to

Closing, Seller will assign all of its rights under any and all insurance policies to Buyer and any insurance proceeds theretofore received by Seller will be paid over or credited to Buyer at Closing and all of Seller's right, title and interest in and to further insurance proceeds will be assigned to Buyer at Closing.

(d) Subject to the foregoing, Seller shall maintain the Property until Closing in the condition the same now is, reasonable wear and tear excepted.

19. **Default**: If Closing does not take place because of Buyer's default under this Agreement, the Deposit shall be given to and/or retained by Seller as liquidated damages. The receipt of these damages shall be Seller's sole and exclusive remedy and satisfaction for such default or any other default; and upon such receipt, this Agreement shall be null and void and of no further force or effect whatsoever, except with respect to Buyer's obligations set forth in Paragraph 3 which shall survive any termination of this Agreement for a period of two years. If Closing shall occur, the Deposit shall be applied to the Purchase Price. If Closing does not occur as a result of the default of Seller then Buyer shall, at its option, have the right to proceed with an action for specific performance or to cancel this Agreement and obtain the return of the Deposit. For purposes of the foregoing, a material breach of any representation or warranty of Buyer or Seller in this Agreement shall be deemed a default. These shall be the exclusive remedies of the parties under this Agreement.

If either party brings an action to recover the Deposit, the non-prevailing party shall (notwithstanding the "exclusive remedies" language set forth in this paragraph) pay the prevailing party's reasonable legal fees, disbursements and court costs expended to obtain a judgment.

20. **Escrow Deposit**.

(a) The Title Company is responsible only for the safekeeping and disbursement of the Deposit as provided herein and shall not be responsible for the resolution of any question of fact or law. The Title Company's duties under this Agreement shall be entirely administrative and not discretionary.

(b) The Title Company is authorized to comply with any orders, judgment or decrees of any court, and shall not be liable as a result of its compliance therewith. Title Company shall apply the Deposit (i) against the purchase price, if Closing occurs, or (ii) deliver to Seller after the Inspection Period as its sole remedy if Buyer fails to purchase the Property and Personal Property or (iii) returned to Buyer if Buyer terminates the Agreement or Seller defaults pursuant to the terms of this Agreement.

(c) The Title Company shall not be required to resolve any controversy between the Seller and Buyer, or any controversy involving any third person, whether the same involves questions of law or fact, or to take any action in connection therewith. In the event of any such controversy, the Title Company shall have the right to (i) hold the Deposit for a time period not in

excess of thirty (30) days until such time as the Title Company has received written notice executed by the Seller and Buyer (and any such third person) that such controversy has been settled by agreement, or (ii) deposit the Deposit into court. Without limiting the foregoing, the Title Company may, in its discretion, institute such interpleader or other proceedings as it may deem proper in any court which the Title Company shall select in Pennsylvania, the costs thereof to be borne by whichever of Seller or Buyer is the losing party.

21. **Brokers**.

(a) Buyer and Seller each warrant to the other that they have not entered into any agreement or are obligated in connection with the transaction to any broker other than Seller's broker, NAI Mertz Corporation. Seller shall be responsible for any commissions due and owing to Seller's broker.

(b) Each party agrees to indemnify and hold the other party harmless from and against any claim or demand by any other broker, finder or other person who may claim a commission related to this transaction.

22. **Recording**. Neither this Agreement nor any memorandum or assignment hereof shall be filed in any public place of record.

23. **Severability**. If any provision of this Agreement, or the application thereof to any person, place or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable or void, the remainder of this Agreement and such provisions as applied to other persons, places and circumstances shall remain in full force and effect.

24. **Execution**. The execution and delivery of this Agreement by Buyer to Seller is conditioned upon Seller delivering a fully executed copy of this Agreement to Buyer within five (5) days thereafter. If Seller does not deliver a copy of this Agreement to Buyer within said period, Buyer may terminate this Agreement by notice to Seller, whereupon Buyer shall be repaid all monies paid on account of the purchase price and neither party shall have any further rights, duties or obligations under this Agreement.

25. **Assignment**. Buyer shall have the right to assign the Agreement of Sale at or prior to Closing to an entity related to nominee provided that Buyer remains liable to Seller and bears any realty transfer tax due as a result of such assignment and will hold Seller harmless for any additional transfer tax and costs. In addition, and in lieu of an assignment, Buyer reserves the right to request from Seller, at Closing, to execute a "Cancellation and Novation Agreement and New Agreement of Sale" which substitutes a designee's appointment by Buyer, as the purchaser of the Property, at the Closing. For the avoidance of any doubt, any such Cancellation and Novation Agreement shall be at no cost to Seller and Buyer shall bear any additional realty transfer tax due as a result of the cancellation and novation agreement.

26. **Successors and Assigns**. This Agreement shall inure to the benefit of and be binding upon Seller and Buyer, and their respective successors and assigns.

27. **Entire Agreement**. This Agreement contains the entire understanding of the parties with respect to the subject matter hereof, supersedes all prior or other negotiations, representations, understandings and agreements of, by or among the parties, express or implied, oral or written, which are fully merged herein. Any agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of this Agreement unless such agreement is in writing and signed by the party against whom enforcement of such change, modification, discharge or abandonment is sought.

28. **Governing Law and Venue**. This Agreement shall be construed, interpreted and applied in accordance with the laws of the Commonwealth of Pennsylvania. Should either party institute legal suit or action for the enforcement of any obligation contained herein, it is agreed that the venue of such action shall be in Philadelphia County, Commonwealth of Pennsylvania.

29. **OFAC**. Seller represents and warrants to Buyer that neither Seller nor any affiliate or representative of Seller, nor any Person directly or indirectly holding any legal or beneficial interest whatsoever in Seller (collectively "**Seller Parties**") is, or at any time during the term of this Agreement shall be: (i) a Person with whom a United States Person or financial institution established under the laws of the United States is prohibited from transacting business of the type described in this Agreement, whether such prohibition arises under U.S. law, regulation, executive order (including without limitation, executive orders and lists published by the United States Office of Foreign Asset Control with respect to "Specially Designated Nationals and Blocked Persons") or otherwise, (ii) included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the persons or entities referred to or described in Executive Order 13224 - Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended, (iii) in violation of any provisions of the USA Patriot Act, Pub. L. No. 107-56. For purposes of this paragraph "Person" means any individual, partnership, corporation, limited liability company, trust or other entity, and "United States Person" means a person that is a citizen or resident of the United States, a corporation, partnership, limited liability company, or other entity created or organized in or under the laws of the United States or any political subdivision thereof, or an estate or trust the income of which is subject to United States federal income taxation regardless of its source. Seller covenants and agrees to deliver to Buyer any certification or other evidence requested from time to time by Buyer, in its sole discretion, confirming Seller's compliance with the provisions of this Paragraph.

30. **Notices**. All notices, consents or other communications required or permitted to be given pursuant to this Agreement shall be valid only if given in writing and shall be deemed sufficiently given if sent by Certified Mail, Return Receipt Requested, by messenger, with a signed acknowledgement of receipt or may be sent prepaid overnight courier service (e.g. Federal Express) addressed to the addressee at the address, as hereinafter set forth, or at such other address as a party may hereafter furnish in writing to the other parties to this Agreement. Any notice given hereunder

to Seller shall also be by email. The date deemed given of any notice hereunder shall be three (3) days business days after postmarked; two (2) days if by overnight mail, One (1) business day if by messenger.

If to Seller:

Attn:
Email:

With a copy to:

Attn:
Email:

If to Buyer:

Derong Liu
4429 N. American Street
Philadelphia, PA 19140

With a copy to:

Dennis George, Esq.
Arangio & George, LLP
2000 Market Street, Suite 1440
Philadelphia, PA 19103
Email: DGeorge@ArangioGeorge.com

If to Title Company:

Neshaminy Abstract
540 Pennsylvania Avenue, Suite 307
Fort Washington, PA 19034
Attn: John T. Croke
Email: jcroke@neshaminyabstract.com

31. **Tax Deferred Exchange**. Either party may elect to effectuate a "like-kind exchange" pursuant to Section 1031 of the Internal Revenue Code. Seller shall fully cooperate, at no out-of-pocket, third-party expense, to the other party in effectuating any like-kind exchange (including the assignment of this Agreement and the execution of any Closing document to a designated like kind exchange intermediary). Seller's and Buyer's effectuation of a like-kind exchange prior to any closing shall not be a condition or contingency to such parties' obligations hereunder. The party shall be responsible for all of its costs and expenses incurred in connection with the effectuation of a like- kind exchange and shall indemnify and hold harmless the other party from any and all losses, costs, expenses and damages associated with its participation in the exchange transaction.

32. **Headings**. The headings of the paragraphs of this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement of affect its meaning in any way.

33. **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall be binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected on this Agreement as the signatories.

34. **Waiver**. No waiver by either party of any failure or refusal by the other party to comply with its obligations shall be deemed a waiver of any other or subsequent failure of refusal to so comply.

35. **Gender, etc**. Words used in this Agreement, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context indicates is appropriate.

36. **Waiver of Tender**. Formal tender of an executed deed and purchase money are hereby waived.

37. **Construction**. This Agreement shall be construed without regard to any presumption or the rule requiring construction against the party causing this Agreement to be drafted. If the words or phrases in this Agreement shall be deemed stricken or otherwise eliminated, this Agreement shall be construed as if the words or phrases so stricken or otherwise eliminated were never included in this Agreement and no implication or inference shall be drawn from the fact that said words or phrases were so stricken or otherwise eliminated.

38. **Captions**. The captions contained in this Agreement are not part of this Agreement. They are only for the convenience of the parties and do not in any way modify, amplify or give full notice of any of the provisions of this Agreement.

39. **Further Action**. Each party agrees to execute such further documents or escrow instructions and to take such further action as may be reasonably necessary or desirable to effectuate the intent and purpose of this Agreement and to consummate the transactions contemplated herein.

40. **WAIVER OF JURY TRIAL**. THE PARTIES ACKNOWLEDGE THAT DISPUTES ARISING UNDER THIS AGREEMENT ARE LIKELY TO BE COMPLEX, THAT TRIAL BEFORE A JUDGE IS MORE APPROPRIATE THAN TRIAL BEFORE A JURY, AND THAT BUYER DESIRES TO STREAMLINE AND MINIMIZE THE COST OF RESOLVING SUCH DISPUTES. THEREFORE, EACH PARTY, AS AN INDEPENDENT COVENANT, IRREVOCABLY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, COUNTERCLAIM, DISPUTE OR PROCEEDING, BASED UPON OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT, AND GRANTS THE JUDGE PRESIDING OVER ANY SUCH ACTION, COUNTERCLAIM, DISPUTE OR PROCEEDING FULL POWER AND AUTHORITY TO DETERMINE ALL QUESTIONS OF FACT AND LAW. THIS WAIVER APPLIES TO ALL CLAIMS AGAINST ALL PARTIES TO ACTIONS AND PROCEEDINGS RELATED TO THIS AGREEMENT.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.
SIGNATURE PAGE TO FOLLOW.

IN WITNESS WHEREOF, the parties hereto, each intending to be legally bound by this writing, have caused this Agreement to be executed the day and year first above written.

**Seller:**

**Attest:**____________________ **By:**__________________________

**Buyer:**

**Witness:**____________________ __________________________

**DERONG LIU**

The Title Company executes this Agreement solely for the purposes of agreeing to Section 2, 3 and 20 of this Agreement.

**Title Company:**

**Dated:**____________________ **By:** __________________________

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

To be provided.

**SCHEDULE 3(a)**
**SELLER'S DOCUMENTS**

**SCHEDULE 7(c)**
**ACTIONS PENDING**

**SCHEDULE 7(d)**
**AGREEMENTS AFFECTING PROPERTY**

**SCHEDULE 11(i)**

**BILL OF SALE**

THIS BILL OF SALE ("Bill of Sale") dated as of ________________, 20____, is made by ______________________________ ("**Seller**"), to _________________________("**Buyer**").

**WITNESSETH:**

WHEREAS, pursuant to an Agreement for the Purchase and Sale of Real Estate between Seller and Buyer, dated _______________, as amended (the "**Agreement of Sale**"), Seller has this date conveyed to Buyer certain parcels of land, together with the buildings and improvements located thereon, known as 1858 Street Road, Bensalem, Pennsylvania 19020 (collectively, the "**Property**"); and

WHEREAS, Seller is executing and delivering this instrument for the purpose of selling and assigning to and vesting in Buyer all of Seller's right, title and interest, if any, in and to the Property, Personal Property and Intangible Property (as defined in the Agreement of Sale); and

NOW, THEREFORE, in consideration of the purchase price provided in the Agreement of Sale and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, and intending to be legally bound, the parties agree as follows:

1. Seller hereby grants, sells, conveys, assigns, transfers, sets over to, and vests in Buyer, its successors and assigns, all of Seller's right, title and interest, legal and equitable, in and to all of the Property, Personal Property and Intangible Property to have and to hold the same, including the appurtenances thereof, unto Buyer, its successors and assigns, forever, to its and their own proper use; and Seller hereby warrants that title to the Property, Personal Property, and Intangible Property is good and marketable and free and clear of all liens, security interests and other encumbrances except the Leases and any permitted encumbrances agreed upon between Seller and Buyer pursuant to the Agreement of Sale.

2. Nothing in this Bill of Sale, expressed or implied, is intended or shall be construed to confer upon or give to any person, firm or corporation other than Seller and Buyer and their respective successors and assigns any remedy or claim under or by reason of this instrument or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Bill of Sale shall be for the sole and exclusive benefit of Seller and Buyer and their respective successors and assigns.

3. Neither the making nor the acceptance of this Bill of Sale shall enlarge, restrict or otherwise modify the terms of the Agreement of Sale or constitute a waiver or release by Seller or Buyer of any liabilities, duties or obligations imposed upon either of them by the terms of the Agreement of Sale, including, without limitation the representations and warranties and other provisions that the Agreement of Sale expressly provides shall survive the date hereof.

4. This Bill of Sale is being executed by Seller and shall be binding upon Seller and its successors and assigns.

5. This Bill of Sale shall be governed by and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

6. This Bill of Sale may be executed in one or more identical counterparts, (including by electronic transmission of a pdf), all of which, when taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be duly executed as of the date first above written.

**Seller:**

Attest:______________________

By:______________________
Name:______________________
Title:______________________

**Buyer:**

Attest:______________________

By:______________________
Name:______________________
Title:______________________

# EXHIBIT "F"

Thread
14 views

Log in

origliobev 02/27/26

Fisher's in Bensalem – closed since summer 2024 – is nearing a long-awaited reopening after major renovations. @buckscotoday says Owner Tommy Liu is transforming the first floor into a seafood buffet and revitalizing the second-floor event spaces, with hopes to welcome guests back by mid-year. Fisher's originally opened in 1962 and expanded in 1976; the renovation follows its closure after co-owner George Pavlis' passing.

bucksco.today/2026...



bucksco.today
Bensalem Institution Fisher's Approaches Reopening After Major Renovation

Related threads

newsonteesside 06/25/26
Popular town centre restaurant set to close as part of chain's rescue plan
thenorthernecho.co.uk/news...



thenorthernecho.co.uk
Popular town centre restaurant set to close as part of chain's rescue plan

breakingnewsteesside 07/15/26
FYI: Well-known restaurant announces closure saying its 'no longer viable' to keep going bntmedia.uk/TTY0b...




thenorthernecho.co.uk

facebook

Log In

## Bensalem Economic Development Corp.'s Post

×

Bensalem Economic Development Corp.
February 18 ·

After an extensive 18-month renovation, Fisher's is getting ready to reopen its doors with a completely reimagined look, including a new seafood buffet on the first floor and refreshed event and catering spaces upstairs.

Led by Tommy Liu of Royal Seafood & Grill and King Seafood in partnership with building owner Jamal Awad, this Bensalem staple is set to begin an exciting new chapter.

We're thrilled to see this iconic local business coming back to life. Stay tuned for the official reopening date!



BUCKSCO.TODAY

Bensalem Institution Fisher's Approaches Reopening After Major Renovation

Like Comment

SIGN UP

MONTCO.TODAY
*Positive, Upbeat Montgomery County News*

# Bensalem Institution Fisher's Approaches Reopening After Major Renovation

**By Alaina Gross**
Published: 5:14 am EST Feb 6, 2026 | Updated: 5:25 am EST Feb 11, 2026



Image via Fishers Banquet Hall, Facebook.

Fisher's, located in Bensalem, which closed in the summer of 2024, will soon be reopening its doors after an extensive renovation.

The Bensalem institution Fisher's, which closed in the summer of 2024, is get closer to reopening its doors following an extensive renovation, writes Miche

The popular eatery is in the process of completing the transformation of the first floor into a seafood buffet restaurant while revitalizing its second-level catering and event spaces.

Tommy Liu, owner of Royal Seafood & Grill and King Seafood in Philadelphia, is leading the transformation. He partnered with Jamal Awad, the building's owner, aiming to reopen by mid-year.

The reopening will mark a new chapter for Fisher's, which began in 1962 as a small seafood eatery on Castor Avenue in Philadelphia. It then expanded in 1976 with a second Bensalem location offering restaurant, catering, and event services. Its original owner, Steve Pavlis, died in 2011, and the business was taken over by his late son, George, who passed away in 2024.

Shortly after his death, Awad, a longtime employee, closed the restaurant to begin a major renovation of the 64,000-square-foot building.

Eighteen months later, Awad and Liu are finally nearing the finish line, with construction on both floors now almost complete.

Read more about Fisher's in Bensalem and what the newly renovated space will offer in the *Bucks County Courier Times*.

SIGN UP

VISTA.TODAY
*Positive, Upbeat Chester County News*

# Bensalem Institution Fisher's Approaches Reopening After Major Renovation

***By Alaina Gross***
Published: 5:14 am EST Feb 6, 2026 | Updated: 1:35 pm EST Feb 17, 2026




Fisher's, located in Bensalem, which closed in the summer of 2024, will soon be reopening its doors after an extensive renovation.

The Bensalem institution Fisher's, which closed in the summer of 2024, is get closer to reopening its doors following an extensive renovation, writes Michele

The popular eatery is in the process of completing the transformation of the first floor into a seafood buffet restaurant while revitalizing its second-level catering and event spaces.

Tommy Liu, owner of Royal Seafood & Grill and King Seafood in Philadelphia, is leading the transformation. He partnered with Jamal Awad, the building's owner, aiming to reopen by mid-year.

The reopening will mark a new chapter for Fisher's, which began in 1962 as a small seafood eatery on Castor Avenue in Philadelphia. It then expanded in 1976 with a second Bensalem location offering restaurant, catering, and event services. Its original owner, Steve Pavlis, died in 2011, and the business was taken over by his late son, George, who passed away in 2024.

Shortly after his death, Awad, a longtime employee, closed the restaurant to begin a major renovation of the 64,000-square-foot building.

Read more about Fisher's in Bensalem and what the newly renovated space will offer in the *Bucks County Courier Times*.

Visit Fishers Bensalem!
Fishers Bensalem

Watch on

***Editor's Note:*** *This post was originally published on BUCKSCO Today in February 2026.*

***Tags:*** *Bensalem, Bucks County, Bucks County Courier Times, Fisher's, George Pavlis, Jamal Awad, Philadelphia, Royal Seafood & Grill And King Seafood, Steve Pavlis, Tommy Liu*

## You Might Also Like

Patch

Sign up

Bensalem, PA

Subscribe

News Feed Events Local Businesses Advertise

Thank you to our Local Business Sponsor: **Steven Singer Jewelers**

Business & Tech

# Fishers Banquet Hall Ready For Comeback

The iconic Street Road event center will be reopening following an extensive 18-month renovation, Bensalem business officials said.

**Dino Ciliberti**, Patch Staff

Posted Fri, Mar 20, 2026 at 8:34 am ET

1




BENSALEM TOWNSHIP, PA — Fishers — a township landmark — is making a comeback.

ADVERTISEMENT

The iconic banquet hall on Street Road — the place where people have rung in the new year, celebrated weddings, baby showers, and birthdays, or shared a meal — is getting ready to open its doors once again.

Fishers, which was listed for sale three years ago, is reimagining itself after an extensive 18-month renovation, said the Bensalem Economic Development Corp.

Find out what's happening in Bensalemfor free with the latest updates from Patch.

Your email address Subscribe

"Fisher's is getting ready to reopen its doors with a completely reimagined look, including a new seafood buffet on the first floor and refreshed event and catering spaces upstairs," the BEDC said.

Led by Tommy Liu of Royal Seafood & Grill and King Seafood in partnership with building owner Jamal Awad, the Bensalem staple is set to begin an exciting new chapter.

ADVERTISEMENT

An opening date has yet to be scheduled.

"We're thrilled to see this iconic local business coming back to life," the BEDC said.

ADVERTISEMENT

Fishers billed itself on its website as "Bucks County's and the Greater Philadelphia Area's premier banquet hall and nightclub."

"From bridal showers and restaurant dining to large wedding receptions and a world-class nightclub, our event space complex lets you celebrate your most memorable days and unforgettable nights," its website states.

The 64,400-square-foot property, which sits on 3.2 acres, was listed by NAI Mertz, a Mount Laurel, N.J.-based commercial real estate company, as a "redevelopment opportunity."

(Google Maps)

*Get more local news delivered straight to your inbox. Sign up for free Patch newsletters and alerts.*

Bensalem Township

# Fisher's slated to reopen as Bensalem landmark begins new chapter

By Michele Haddon, 2026-02-02



A long-standing Bensalem institution is gearing up for its comeback.

Fisher's, which closed its doors in the summer of 2024, has been undergoing a massive renovation to transform the first floor into a seafood buffet restaurant and bring life back into its catering and event spaces on the second floor.

Leading the effort is Tommy Liu, the owner of Royal Seafood & Grill and King Seafood in Philadelphia. He's teamed up with the building's owner, Jamal Awad, in hopes of reopening by mid-year.




**TGI Fridays returns to Street Road:** Bensalem's TGI Fridays has reopened on Street Road. What to know

It will mark a new chapter for Fisher's, which first started as a small seafood joint along Castor Avenue in Philadelphia in 1962, then expanded with a second location Bensalem as a restaurant, catering and event business in 1976 under its original owner, Steve Pavlis, who died 2011. This was years after passing the business onto his late son, George, who died in 2024.

Soon after George's passing, Jamal Awad, a longtime employee who worked with the family for three decades before partnering with George in 2016, closed Fisher's to allow for the time needed to renovate the 64,000-square foot building, according to Mo Awad, Fisher's general manager. He's the son of Jamal Awad.

More than 18 months later, as Liu and Jamal Awad eye the finish line, construction of the first floor is well underway. Entirely gutted and reframed, the space is currently undergoing a full fit out to achieve the modern design Liu has envisioned for his new restaurant.



Upstairs, the two large banquet halls — with their Italian crystal chandeliers, custom woodworking and original decor — remain largely unchanged aside from some minor updates.

In addition, brand-new kitchen equipment has been installed on both floors. Work on the building's exterior to update the façade, lighting, signs and front entrance is expected to begin soon.

Liu and Jamal Awad said they aim to have construction completed by late spring or early summer.

*Michele Haddon can be reached at mhaddon@usatodayco.com. Please consider supporting local journalism with a subscription.*

*This article originally appeared on Bucks County Courier Times: Fisher's slated to reopen as Bensalem landmark begins new chapter*

24

COMMENTS

Login to write comments

Response

Community Policy

YOU MAY ALSO LIKE

**Hype Hub**
user · 11.1K followers

## Former Burglar Warning: Why leaving a lamp on when you go out makes you a target (and the $20 fix)

Has anyone else ever headed out for a Friday night dinner, or packed the car for a weekend trip, and made sure to leave a living room lamp on before locking the front door? I did this every single time I left the house, thinking I...

13d

45 Share

**Hype Hub**
user · 11.1K followers

Instagram

Log In Sign Up



bensalemedc • Follow

bensalemedc 21w
After an extensive 18-month renovation, Fisher's is getting ready to reopen its doors with a completely reimagined look, including a new seafood buffet on the first floor and refreshed event and catering spaces upstairs.

Led by Tommy Liu of Royal Seafood & Grill and King Seafood in partnership with building owner Jamal Awad, this Bensalem staple is set to begin an exciting new chapter.

We're thrilled to see this iconic local

1

February 18

Log in to like or comment.

More posts from bensalemedc

# EXHIBIT "G"

**From:** Louis Lipsky
**To:** awad382@gmail.com; saoudawad1@verizon.net
**Cc:** Jeff Licht; Bobbi Jean Formosa; Scott Brandt; Rachel Freedman
**Subject:** 1950 Street Road Commissions due
**Date:** Wednesday, July 8, 2026 12:31:33 PM

---

Hi Jamal and Mohammad. I hope that you have been well, as it has been a long time since we last talked. I have been retained by NAI Mertz to file an action against JNG Holdings and both of you, individually, for sale and leasing commissions relative to the old Fisher's property. It is also our intention to file an emergency motion to protect NAI Mertz's interest and have proceeds set aside so that we will be paid should the property be sold during the pendency of the lawsuit. While there may not be a formal listing agreement executed by JNG, NAI Mertz has equitable claims for unjust enrichment as a result of producing a buyer/tenant for the property. Because I have never represented JNG, and never represented anyone in George's estate. I do not have a conflict of interest in this matter. As an aside, I'm not sure why the property was conveyed just prior to George's death because if you had waited until after he died you would have received a stepped up basis for tax purposes, but no one consulted with me on this.

Since we have a relatively long history when Jamal was helping out George, I thought that maybe it was worth a telephone conversation prior to my institution of a lawsuit, which will be extremely expensive to defend, to see if we can come to a resolution without expending substantial money. If you are interested, please respond to this email by the end of this week and we will set something up. If not, we will meet once again in the litigation.

I hope to hear from you by the end of the week.

Thanks,
Louis

Louis I. Lipsky, Esquire
Lipsky and Brandt
1101 Market Street
Suite 2820
Philadelphia, PA 19107
Telephone: (215) 922-6644
Facsimile: (215) 440-7185
www.lipskybrandt.com